UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA FULLER, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>BLOOM INSTITUTE OF TECHNOLOGY, et al.,<br><br>    Defendants. | Case No. 23-cv-01440-AGT<br><br>**ORDER DENYING PLAINTIFFS' MOTION TO REMAND OR IN THE ALTERNATIVE FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY**<br><br>Re: Dkt. No. 25 |

Shortly after plaintiffs filed this putative class action in California state court, defendants removed it to federal court under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d). Currently pending is plaintiffs' motion to remand or, in the alternative, for leave to conduct jurisdictional discovery. Dkt. 25. The sole disputed issue is whether defendants have satisfied the $5 million amount-in-controversy requirement for removal under CAFA.[1] The Court finds that they have, and explains why below. Plaintiffs' motion to remand is therefore denied.

### I. BACKGROUND

**A.    Complaint Allegations and Procedural History**

Plaintiffs filed their class action complaint in San Francisco Superior Court in March 2023, alleging that defendants Bloom Institute of Technology (formerly known as Lambda School), a for-profit online computer coding bootcamp, and Austen Allred, Bloom's founder and CEO, violated various California consumer protection statutes by, among other things, misrepresenting, Bloom's job placement rates and approval status with the State of California. As alleged, Bloom's

---

[1] "In addition to the $5 million amount in controversy requirement, CAFA jurisdiction also requires a class of more than 100 members who are minimally diverse." *Jauregui v. Roadrunner Transportation Servs., Inc.*, 28 F.4th 989, 991 n.2 (9th Cir. 2022). Plaintiffs do not dispute that the latter two requirements are met here.

"business model is predicated on convincing prospective students to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year." Dkt. 19 at 7, Compl. ¶ 24. As further alleged, Bloom carries out this model by having students sign income share agreements (ISAs), under which the students pay no tuition upfront and instead agree to pay Bloom a fixed percentage of their future income—"capped at a maximum repayment of $30,000"—if they get a qualifying job within 60 months after completing Bloom's program. *See id.* ¶ 25 & Exs. A, B, C, D. At all relevant times, Bloom "charged between $21,000 and $30,000 for its program" and "operated as a 'finance lender' because both its ISAs and other tuition payment plans qualify as either consumer or commercial loans under [California] Financing Law." *Id.* ¶¶ 19, 96.

Plaintiffs, four former Bloom students who signed an ISA in 2020 or 2021, allege that they and thousands of other similarly situated students "enrolled at [Bloom] under false pretenses." *Id.* ¶¶ 3, 7. Plaintiffs allege that defendants falsely represented that Bloom "only got paid after students found employment and got paid," when "in reality [Bloom] sold off the rights to collect on students' future income to private investors." *Id.* ¶¶ 3, 5. Defendants also allegedly "misrepresented that [Bloom] had state approval to operate when, in fact, it did not." *Id.* ¶ 3. And defendants allegedly "publicly flaunted job placement rates of 74 to 90 percent" while simultaneously revealing to Bloom's private investors that "the true rates were far lower, ranging from 27 to 50 percent." *Id.* Plaintiffs allege that they "would not have signed an ISA that indebted [them] up to $30,000 of tuition to [Bloom]" had defendants truthfully represented Bloom's job placement rates. *Id.* ¶¶ 110, 119, 126, 136.

Plaintiffs seek to represent a class of all current and former Bloom students who "(i) entered into an ISA, retail installment contract [RIC], deferred tuition plan, or any other tuition payment plan with an arbitration clause that contains a carve-out for any proceeding commenced by either party seeking an injunction or any other equitable remedy; or (ii) who otherwise did not sign any such agreements with an arbitration clause, or opted out of one; and (iii) who have not yet had their ISA, [RIC], deferred tuition plan, or other tuition payment plan cancelled and all payments made to [Bloom] refunded." *Id.* ¶ 142. As alleged, the putative class includes

2

thousands of students who enrolled at Bloom "from on or around March of 2020 to the present." *Id.* ¶ 6.

Plaintiffs seek multiple forms of equitable relief on behalf of themselves and the putative class, including: (1) a declaration that "the ISAs or other tuition payment plans entered into by Plaintiffs [and] the Class . . . are unlawful and unenforceable," (2) an injunction "to cancel the ISAs and other tuition payment plans for Plaintiffs and the Class and enjoin any effort to collect upon or otherwise enforce them," and (3) "restitution in the form of refunds for all payments made" pursuant to the ISAs and other tuition payment plans at issue. *See id.*, Prayer for Relief ¶¶ 4, 9–10. Plaintiffs also seek attorney's fees. *Id.* ¶ 13. Plaintiffs do not plead an amount in controversy in their complaint.

Defendants subsequently removed the case to federal court, asserting CAFA jurisdiction.[2] Dkt. 19. Plaintiffs responded with the instant motion to remand or, in the alterative, for leave to conduct jurisdictional discovery. Dkt. 25. Defendants filed an opposition (Dkt. 32), plaintiffs filed a reply (Dkt. 33), and the Court held a hearing (*see* Dkt. 47).

### B. CAFA Removal and Motion to Remand

In their amended notice of removal, defendants asserted that the amount in controversy exceeds $5 million based on (1) the allegations in plaintiffs' complaint, including that plaintiffs are "indebted to one or more Defendants in amounts of 'up to $30,000,'" (2) the description of the putative class, and (3) the class-wide relief plaintiffs seek, including cancellation of all existing ISAs or other tuition payment plans and repayment of all amounts paid to defendants under those agreements. Dkt. 19 at 4. Defendants additionally noted that plaintiffs' request for attorney's fees may also be properly included in the amount in controversy. *Id.*

In their pending motion to remand, plaintiffs argue that defendants "do not plausibly allege CAFA's $5 million amount in controversy, as they must for the Court to maintain CAFA

---

[2] Defendants initially removed the case based on diversity jurisdiction under 28 U.S.C. § 1332(a), *see* Dkt. 1, but after plaintiffs moved to remand on the basis that the forum defendant rule prohibited removal, *see* Dkt. 17, defendants timely filed an amended notice of removal invoking federal jurisdiction under CAFA, 28 U.S.C. § 1332(d), *see* Dkt. 19, and plaintiffs withdrew their initial remand motion as moot, *see* Dkt. 20 at 2 n.1.

jurisdiction, because their Amended Notice of Removal is silent as to how that amount in controversy should be calculated, [or] any legal or factual support for that calculation." Dkt. 25 at 3. Plaintiffs further argue that "to the extent Defendants' Amended Notice of Removal can be read to suggest that the $30,000 per-student figure is a relevant factor in the amount-in-controversy calculation, [defendants] are engaging in the type of 'speculation and conjecture, with unreasonable assumptions' that precludes them from establishing CAFA jurisdiction." *Id.* at 6 (quoting *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015)). According to plaintiffs, "the relevant measure is the amount *paid* towards ISAs, not the $30,000 maximum possible value of the ISA at signing . . . because any debt created by the ISAs is *conditional* on the student getting a qualifying job to trigger payment obligations." *Id.*

In opposition to plaintiffs' motion to remand, defendants offer the declaration of Stephen Will, Bloom's Data Science and Analytics Manager, to establish that the amount in controversy exceeds $5 million. *See* Dkt. 32-1, Will Decl. Relying on the data in Will's declaration and the allegations and prayer for relief in plaintiffs' complaint, defendants assert that plaintiffs "have put at least $40,828,509 in controversy," excluding attorney's fees. Dkt. 32 at 16. Defendants' calculation breaks down as follows:

> $ 1,947,272 paid by students under an ISA or RIC entered since March 2020
>    34,166,138 outstanding under fully vested ISAs and RICs entered since March 2020[3]
>     4,715,100 paid by students under a tuition payment plan other than an ISA or RIC
> $40,828,510

*See id.* at 13–14; Will Decl. ¶¶ 4–6 & Exs. A, B, C. Defendants' records reflect that there are approximately 1,549 students who signed an ISA or RIC that is now fully vested, and approximately 445 students who enrolled under a tuition payment plan other than an ISA or RIC. *See* Dkt. 32 at 14; Will Decl., Exs. B, C. Defendants also assert that they have "carried their burden to include a 25% attorneys' fee in the amount-in-controversy calculation." Dkt. 32 at 16.

---

[3] Will's declaration explains that "[a]n agreement vests when a student progresses through their respective education program such that their individual financing agreements become effective depending on their terms." Will Decl. ¶ 3.

4

On reply, plaintiffs do not contest defendants' reliance on the $1.9 million in ISA/RIC payments, nor do they dispute that attorney's fees may be included at 25% of the total amount in controversy. Dkt. 33 at 6; *see also* Dkt. 47 at 14–15. Plaintiffs instead challenge defendants' inclusion of the outstanding ISA/RIC balances ($34.2 million) and the non-ISA/RIC payments ($4.7 million) in the amount-in-controversy calculation. Plaintiffs argue that defendants' "reliance on outstanding payments is purely speculative" and "unreasonably presupposes continued unlawful collection by Defendants." Dkt. 33 at 2, 4. And plaintiffs argue that defendants "fail to demonstrate that any of the non-ISA/RIC agreements making up the $4.7 million are part of the class." *Id.* at 9 (emphasis omitted). According to plaintiffs, therefore, defendants "have only shown the amount in controversy to be, at most, $1.9 million plus attorneys' fees, far short of CAFA's $5 million requirement." *Id.* at 5.

## II.  CAFA JURISDICTION

CAFA gives federal courts original jurisdiction over class actions that have a class of over 100 members, minimal diversity between the parties, and an amount in controversy of more than $5 million. 28 U.S.C. § 1332(d); *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 85 (2014). The Supreme Court has explained that "CAFA's provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Dart Cherokee*, 574 U.S. at 89 (simplified); *see also Ibarra*, 775 F.3d at 1197 ("Congress intended CAFA to be interpreted expansively."). To that end, "although a presumption against federal jurisdiction exists in the usual diversity case, 'no antiremoval presumption attends cases invoking CAFA.'" *Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 772 (9th Cir. 2020) (quoting *Dart Cherokee*, 574 U.S. at 87). As already noted, the only dispute here is whether CAFA's amount-in-controversy requirement is met.

To determine the amount in controversy, courts "first look to the complaint." *Ibarra*, 775 F.3d at 1197. When, as here, "federal jurisdiction is challenged and the complaint is silent about damages, 'the defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million." *Greene*, 965 F.3d at 771–72 (quoting *Ibarra*, 775 F.3d at 1197); *see also Sanchez v. Monumental Life Ins. Co.*, 102 F.3d

5

398, 404 (9th Cir. 1996) (explaining that a preponderance of the evidence means "it is 'more likely than not' that the amount in controversy exceeds" the jurisdictional threshold). In such a case, both sides "may submit evidence supporting the amount in controversy before the district court rules." *Harris v. KM Indus., Inc.*, 980 F.3d 694, 699 (9th Cir. 2020). This evidence may include "affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Ibarra*, 775 F.3d at 1197 (simplified).

"To meet CAFA's amount-in-controversy requirement, a defendant needs to plausibly show that it is reasonably possible that the potential liability exceeds $5 million." *Greene*, 965 F.3d at 772. The amount in controversy is "simply 'the amount at stake in the underlying litigation.'" *Jauregui*, 28 F.4th at 994 (citation omitted). "Importantly, that 'amount at stake' does not mean likely or probable liability; rather, it refers to *possible* liability." *Id.* (simplified). Put differently, the amount in controversy represents "the *maximum* recovery the plaintiff *could* reasonably recover." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019) (second emphasis added). It is "simply an estimate of the total amount in dispute," *id.*, and it "includes *all relief* claimed at the time of removal to which the plaintiff would be entitled if she prevails," *Fritsch v. Swift Transportation Co. of Arizona, LLC*, 899 F.3d 785, 794 (9th Cir. 2018) (quoting *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 418 (9th Cir. 2018)). "When measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint." *Fong v. Regis Corp.*, 2014 WL 26996, at *2 (N.D. Cal. Jan. 2, 2014). And "when a statute or contract provides for the recovery of attorneys' fees, prospective attorneys' fees must be included in the assessment of the amount in controversy." *Arias*, 936 F.3d at 922 (citing *Fritsch*, 899 F.3d at 794).

In meeting its burden to establish CAFA jurisdiction, a defendant "need not make the plaintiff's case for it or prove the amount in controversy beyond a legal certainty." *Harris*, 980 F.3d at 701. Rather, "the defendant's showing on the amount in controversy may rely on reasonable assumptions." *Arias*, 936 F.3d at 922 (citing *Ibarra*, 775 F.3d at 1197–99). An assumption may be reasonable "if it is founded on the allegations of the complaint," *id.* at 925, or

if it is "grounded in real evidence, such as an affidavit," *Ibarra*, 775 F.3d at 1199. A defendant cannot, however, rely on "mere speculation and conjecture, with unreasonable assumptions" to meet its burden. *Id.* at 1197. Ultimately, "CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Id.* at 1198.

### III.  DISCUSSION

Applying the above principles, the Court finds that defendants have met their burden of proving, by a preponderance of the evidence (i.e., that it is more likely than not), that more than $5 million is in controversy. The Ninth Circuit has made clear that the amount in controversy "is determined by the complaint operative at the time of removal and encompasses all relief a court may grant on that complaint if the plaintiff is victorious." *Fritsch*, 899 F.3d at 791 (quoting *Chavez*, 888 F.3d at 414–15). To demonstrate the amount in controversy in this case, defendants focus on plaintiffs' requests for the following relief: (1) restitution, (2) declaratory and injunctive relief, and (3) attorney's fees.

#### A.  Restitution

In their complaint, plaintiffs demand that defendants "pay restitution in the form of refunds for all payments made" under an ISA, RIC, or other tuition payment plan falling within the putative class definition. *See* Compl., Prayer for Relief ¶ 10. Relying on Will's declaration, defendants assert that this demand puts $6,662,371 in controversy as defendants' records reflect that $1,947,272 has already been paid by students under a qualifying ISA or RIC, and another $4,715,000 has been paid by students "under a financing plan other than an ISA or a RIC." Dkt. 32 at 13–14 (citing Will Decl. ¶¶ 4–6 & Exs. A, B, C). As noted, plaintiffs do not contest defendants' inclusion of the $1.9 million in ISA/RIC payments in the amount-in-controversy calculation. *See* Dkt. 33 at 3. However, plaintiffs argue that the $4.7 million in non-ISA/RIC payments should be excluded because defendants have not shown that the agreements underlying those payments either lack an arbitration clause or contain an arbitration clause with an equitable

7

remedy carveout.[4] *Id.* at 2. The Court agrees.

Unlike defendants' showing as to the amounts paid and owed under "fully vested ISAs and RICs entered into between March 2020 and the present"—agreements which are clearly at issue in this case—defendants have not sufficiently proven that the non-ISA/RIC agreements meet the putative class definition. *Compare* Will Decl. ¶ 3 (noting that the complaint "define[s] the class as consisting of students who were subject to the particular arbitration provision identified by Plaintiffs in their Complaint" and stating that "that provision was first incorporated into ISAs and RICs in or around March 2020") and Dkt. 33 at 9 n.2 (plaintiffs acknowledging that they "are not aware of an ISA/RIC from March 2020 and thereafter lacking a qualifying arbitration clause with an equitable remedy carveout") *with* Will Decl. ¶ 3 (stating that "I do not specifically know when that [qualifying arbitration] provision was incorporated into other students' agreements [i.e., non-ISA/RIC agreements], [but] for purposes of this exercise my team assumed it was also incorporated in or around March 2020, which I understand to be a fair assumption") and Dkt. 33 at 8–9 (plaintiffs arguing that Will's declaration "does not even say that the non-ISA/RIC agreements have language that would place them within the class, let alone explain why the *assumption* that such language exists is 'fair'"). Further, during the hearing on plaintiffs' remand motion, defense counsel explained that defendants are not in possession of the non-ISA/RIC agreements and "don't have visibility into [] whether [those] agreements have an equitable carve-out in the arbitration provision." *See* Dkt. 47 at 32–33.

On this record, the $4.7 million paid under the non-ISA/RIC agreements cannot be counted toward the amount in controversy. Nevertheless, as discussed below, even excluding the non-ISA/RIC payments, defendants have still shown that the amount in controversy more likely than not exceeds $5 million.

---

[4] To support this contention, plaintiffs submitted what they describe as "an example of a non-ISA/RIC agreement showing that its signatory is not part of the putative class," as "the agreement was signed in January 2022, and contains an arbitration clause without an equitable remedy carveout." Dkt. 33 at 9 (citing Dkt. 34, Bahena Decl. ¶ 2 & Ex. A). As defense counsel noted at the hearing, defendants are not parties to that January 2022 agreement, nor is it clear that the agreement even pertains to Bloom. *See* Dkt. 47 at 32–33.

### B. Declaratory and Injunctive Relief

At the heart of plaintiffs' complaint is their request for "declaratory and injunctive relief to cancel their ISAs and the ISAs/tuition payment plans of all class-members, [and] to declare the ISAs/tuition payment plans null and void." Compl. ¶ 9; *see id.*, Prayer for Relief ¶ 4 (seeking a declaration "that the ISAs or other tuition payment plans entered into by Plaintiffs [and] the Class . . . are unlawful and unenforceable"); *id.* ¶ 9 (seeking an injunction "to cancel the ISAs and other tuition payment plans for Plaintiffs and the Class and enjoin any effort to collect upon or otherwise enforce them"). Will's declaration and defendants' summary data attached thereto reflect that there is "$34,166,138 outstanding under fully vested ISAs and RICs entered into between March 2020 and the present." Will Decl. ¶ 5 & Ex B. That outstanding $34.2 million, defendants argue, is "at stake" in this case given that plaintiffs seek a judgment that would void the underlying ISAs and RICs and render collectability impossible. The Court agrees.

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977). In calculating the value of an injunction, "the amount in controversy requirement is satisfied if either party can gain or lose the jurisdictional amount (the so-called 'either viewpoint' rule)." *In re Ford Motor Co./Citibank (S. Dakota), N.A.*, 264 F.3d 952, 958 (9th Cir. 2001) (quoting *Ridder Bros. v. Blethen*, 142 F.2d 395, 399 (9th Cir. 1944) ("The value of the thing sought to be accomplished by the action may relate to either or any party to the action.") (simplified)). Under this "either viewpoint" rule, "the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce." *Corral v. Select Portfolio Servicing, Inc.*, 878 F.3d 770, 775 (9th Cir. 2017) (quoting *In re Ford*, 264 F.3d at 958); *see Guerard v. CNA Fin. Corp.*, 2009 WL 10710608, at *3 (N.D. Cal. July 31, 2009) (noting that it "is proper under CAFA to consider the defendant's cost of compliance with an injunction just as it is proper to consider the plaintiff's benefit from the injunction" and explaining that "whichever party stands to gain or lose a greater amount is the one whose viewpoint is taken into account for jurisdictional purposes").

The "object of the litigation" in this case is a declaration and injunction to cancel and

preclude further enforcement of the ISAs and RICs signed by approximately 1,549 students in the putative class. Plaintiffs themselves allege that those agreements are "a form of student loan" under which Bloom is the "finance lender" and students are "indebted [to Bloom] for up to $30,000 of tuition." Compl. ¶¶ 47, 96, 98; *see also id.* ¶ 49 (Bloom's "tuition payment plans, including ISAs, constitute a 'note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program'"); *id.* ¶ 96 (Bloom's "ISAs and other tuition payment plans qualify as either consumer or commercial loans"); *id.* ¶ 99 ("a representation that an ISA is 'not a loan' is deceptive and misleading . . . because 'ISAs are loans and do create debt'"); *id.* ¶ 103 (Bloom "is operating as a finance lender" by "making ISAs and other tuition payment plans"). To defendants, the total value of the ISAs and RICs at issue is $36,113,410, which includes the $1,947,272 already collected and the $34,166,138 still outstanding. *See* Will Decl. ¶ 5 & Ex. B. As defendants persuasively argue,

> Whether Defendants' pecuniary loss is suffered by the repayment of money or the inability to collect money [under the ISAs and RICs], they both lead to the same result. Under either measure, Defendants will be barred from collecting up to $30,000 for every successful putative class member. To put it another way, for purposes of calculating the amount in controversy, Plaintiffs have provided no reason to believe that there is any practical difference between a dollar repaid and a dollar no longer owned [sic] from the perspective of the borrower; in either case the borrower is a dollar richer and the lender a dollar poorer.

Dkt. 32 at 11. Plaintiffs contend that the $34.2 million in outstanding ISA/RIC payments is not properly included in the amount in controversy because "the ISA/RIC repayment obligations are not for a sum certain but are contingent on meeting certain employment conditions." Dkt. 33 at 6. Had plaintiffs limited their requested relief to restitutionary refunds, this argument might have more traction. However, by seeking declaratory and injunctive relief to cancel all existing ISAs and RICs and enjoin all future collection and enforcement efforts, plaintiffs have put the "total amount" of those agreements "in dispute." *See Arias*, 936 F.3d at 927; *see also Castro v. ABM Indus., Inc.*, 2017 WL 4682816, at *3 (N.D. Cal. Oct. 19, 2017) (noting that the "ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint").

Plaintiffs also contend that "case law . . . forecloses including the outstanding, post-

removal balances at issue because it unreasonably assumes Defendants will continue to violate the law" by collecting payments under the ISAs and RICs. Dkt. 33 at 6 (citing *Aseltine v. Panera, LLC*, 2021 WL 8267421, at *2 (N.D. Cal. Dec. 13, 2021)). This argument fares no better as it, too, ignores the declaratory and injunctive relief requested in plaintiffs' complaint. To that end, plaintiffs' reliance on *Aseltine* is misplaced. There, the plaintiff alleged that Panera deceived him and other California consumers by secretly adding a 5-to-10% markup on online food delivery purchases and his complaint sought to recover class-wide compensatory damages for the amount Panera wrongfully acquired through its hidden markup scheme. *Aseltine*, 2021 WL 8267421, at *1–2. Panera, in an effort to establish CAFA jurisdiction, argued that the amount in controversy should include future hidden markup damages—which "would be contingent on [Panera] engaging in the same alleged wrongful conduct and future consumers making online delivery purchases at the same level as before removal"—because the complaint sought damages "to the date of class certification." *Id.* at *2 (simplified). In rejecting Panera's argument, the court explained that "[s]uch future damages are speculative because they do not stem from wrongdoing that has already occurred, but rather assume that wrongdoing *will be done* in the future." *Id.* This reasoning is inapposite here. Plaintiffs' complaint does not seek or even mention damages (presumably by design[5]) and the relief that it does seek—including a declaration invalidating all existing ISAs and RICs and an injunction precluding further enforcement of those agreements—is based on alleged wrongdoing that has *already occurred*. Thus, contrary to plaintiffs' assertions, including the outstanding ISA/RIC amounts in the amount in controversy does not "unreasonably assume[] Defendants will continue to violate the law." Dkt. 33 at 6.

Finally, plaintiffs argue that even if the outstanding ISA/RIC amounts can be included in the amount in controversy, defendants have failed to prove "the likelihood that [defendants] will receive payments to close the gap between $1.9 million and $5 million during the pendency of the action." *Id.* at 7. The Court disagrees. Moreover, as already explained, if plaintiffs succeed in

---

[5] As noted, a Bloom student's eligibility in the proposed class is predicated on the inclusion of "an arbitration clause that contains a carve-out for any proceeding commenced by either party *seeking an injunction or any other equitable remedy*" (or the lack of an arbitration clause altogether) in their ISA or RIC. *See* Compl. ¶ 142 (emphasis added).

obtaining the class-wide declaratory and injunctive relief they seek, plaintiffs and more than 1,500 members of the putative class will be relieved indefinitely of their obligations and $34.2 million in collective indebtedness under their existing ISAs and RICs.  *See Guerard*, 2009 WL 10710608, at *3 (noting that under CAFA, "it is proper to consider the plaintiff's benefit from the injunction" for purposes of calculating the amount in controversy).

In short, the Court finds that defendants have "plausibly show[n] that it is reasonably possible" that the amount in controversy exceeds $5 million.  *Greene*, 965 F.3d at 772.

### C. Attorney's Fees

Plaintiffs also request attorney's fees, *see* Compl., Prayer for Relief ¶ 13, and if they prevail on their claim under the California Consumer Legal Remedies Act, they are entitled to an award of attorney's fees, *see* Cal. Civ. Code § 1780(e).  The Ninth Circuit has "long held (and reiterated [in early 2018]) that attorneys' fees awarded under fee-shifting statutes or contracts are included in the amount in controversy." *Arias*, 936 F.3d at 927 (quoting *Fritsch*, 899 F.3d at 794).  Indeed, "a court must include future attorneys' fees recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met." *Id.*  "The defendant retains the burden, however, of proving the amount of future attorneys' fees by a preponderance of the evidence." *Id.* at 927–28.

Plaintiffs agree that attorney's fees should be included in the amount in controversy, and they do not dispute that defendants have met their burden to include a 25% attorney's fee in the calculation.  *See* Dkt. 33 at 6; Dkt. 47 at 14–15; *see also Greene*, 965 F.3d at 774 n.4 ("Based on [defendant's] evidence that Greene's attorney sought 35 percent in a similar case, it is reasonable to assume that Greene's attorney would seek fees equal to 25 percent of the amount in controversy if he were to prevail."); *Aseltine*, 2021 WL 8267421, at *4 (N.D. Cal. Dec. 13, 2021) (noting that "25% of the total recovery remains the 'benchmark award' for attorney's fees, and courts in this district generally apply that benchmark absent special circumstances").

### IV. CONCLUSION

For the reasons stated, defendants have met their burden of proving that it is more likely than not that the amount in controversy exceeds $5 million.  Plaintiffs' motion to remand or, in the

alternative, for leave to conduct jurisdictional discovery is therefore denied.

**IT IS SO ORDERED.**

Dated: November 13, 2023

ALEX G. TSE
United States Magistrate Judge