BRIAN DANITZ (SBN 247403)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
bdanitz@cpmlegal.com

ALEXANDER S. ELSON
**NATIONAL STUDENT LEGAL DEFENSE NETWORK**
1701 Rhode Island Ave. NW
Washington, DC 20036
Telephone: (202) 734-7495
alex@defendstudents.org

DAVID BALTMANIS
**MINER, BARNHILL & GALLAND, P.C.**
325 N. La Salle St., Suite 350
Chicago, IL 60654
Telephone: (312) 751-1170
dbaltmanis@lawmbg.com

RYAN MILLER
**MINER, BARNHILL & GALLAND, P.C.**
44 E. Mifflin St., Suite 803
Madison, WI 53703
Telephone: (608) 255-5200
rmiller@lawmbg.com

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESSICA FULLER; ALEXANDER GONCALVES; BRETT MCADAMS; and QUINN MOLINA,<br><br>    Plaintiffs,<br><br>v.<br><br>BLOOM INSTITUTE OF TECHNOLOGY, formerly d/b/a Lambda School; AUSTEN ALLRED, in his individual capacity; and DOES 1 through 9,<br><br>    Defendants. | Case No. 3:23-CV-01440-AGT<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR EQUITABLE RELIEF BASED ON**:<br><br>1.  **VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code §§ 1750, et seq.)**<br><br>2.  **VIOLATIONS OF THE UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code §§ 17200, et seq.)**<br><br>3.  **VIOLATIONS OF THE FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code §§ 17500, et seq.)** |

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

## <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

I.      SUMMARY OF THE CASE ...................................................................................1

II.     THE PARTIES ........................................................................................................3

III.    JURISDICTION AND VENUE ..............................................................................4

IV.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS .................................5

        A.      LAMBDA BACKGROUND .........................................................................5

        B.      UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW ......................7

        C.      LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES....................14

                1.      False and misleading job placement rates on Lambda's website and outcomes reports............................................................................15

                2.      Lambda's false and misleading statements about job placement in social media postings and comments. ...............................................23

                3.      Mr. Allred's false and misleading statements about job placement and role as driving force behind Lambda's job placement rate marketing campaign...........26

                4.      While inflating its job placement rates, Lambda misrepresents that it only gets paid once students do ...........................................28

        D.      LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING ......................................................29

        E.      PLAINTIFFS ATTEND LAMBDA, ATTRACTED BY HIGH JOB PLACEMENT RATES AND THE APPEARANCE THAT THE "SCHOOL" WAS APPROVED TO OPERATE.................................................31

                1.      Plaintiff Jessica Fuller ...........................................................31

                2.      Plaintiff Alexander Goncalves ...............................................33

                3.      Plaintiff Brett McAdams .........................................................35

                4.      Plaintiff Quinn Molina ...........................................................38

V.      CLASS ACTION ALLEGATIONS .......................................................................39

VI.     CAUSES OF ACTION ..........................................................................................42

        FIRST CAUSE OF ACTION Violations of California's Consumer Legal Remedies ActCal. Civ. Code §§ 1750, et seq. (All Defendants) ...........................42

        SECOND CAUSE OF ACTION Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, et seq. (All Defendants) ...............................43

THIRD CAUSE OF ACTION Violations of California's False Advertising Law Cal. Bus. & Prof. Code §§ 17500, *et seq.* (All Defendants) ................................................................46

VII.    PRAYER FOR RELIEF....................................................................................................47

Plaintiffs Jessica Fuller, Alexander Goncalves, Brett McAdams, and Quinn Molina ("Plaintiffs"), by and through their attorneys, allege as follows:

**I.      SUMMARY OF THE CASE**

1.      Bloom Institute of Technology, formerly known as Lambda School ("Lambda"), is a for-profit, unaccredited computer coding bootcamp that opened in 2017, audaciously promising to revolutionize higher education. Unlike traditional higher education, with its high debt load, uncertain job prospects, and structural indifference to job outcomes, Lambda claimed its approach would be different. By its telling, Lambda would not only teach students coding, but would connect students with tech jobs, and require tuition payments only after students got qualifying jobs—accomplished by having them sign Income Share Agreements ("ISAs") before enrolling. Lambda and its CEO, Austen Allred, trumpeted ISAs as a disruptive, revolutionary approach to education financing, promising students that, because they paid nothing until they found a job, Lambda was equally invested in students' ultimate job market success.

2.      As evidence that Lambda's model worked, it promoted lofty job placement rates. For the last several years, Lambda has prominently displayed job placement rates of 71 to 90 percent across its website, social media pages, and online advertisements. In time, Lambda's aggressive marketing, touting that the vast majority of its students get well-paying tech jobs, swelled its enrollment to thousands of students.

3.      But Lambda's entire marketing pitch was based on a series of misrepresentations. While Lambda publicly flaunted job placement rates of 74 to 90 percent, it revealed to its private investors that the true rates were far lower, ranging from 27 to 50 percent. While Lambda's public marketing emphasized how the school was invested in students' success, claiming that Lambda wouldn't get paid unless students did, in reality Lambda sold off the rights to collect on students' future income to private investors. Lambda even misrepresented that it had state approval to operate when, in fact, it did not. Through these misrepresentations, Lambda ensnared thousands of students in its scheme to extract (or sell off the rights to extract) tens of thousands of dollars from each students' future earnings.

4.      Plaintiffs, four such students, bring this class action complaint, on behalf of themselves and a class of similarly situated persons, against Lambda, Lambda's co-founder and CEO, Austin

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1    Allred, in his personal capacity, and John Does 1–9 for violations of the California Consumer Legal

2    Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*, Unfair Competition Law ("UCL"),

3    California Business and Professional Code §17200, *et seq.*, and False Advertising Law ("FAL"),

4    California Business and Professional Code § 17500, *et seq.*

5         5.    Plaintiffs bring this action to hold Defendants accountable for: (i) falsifying and

6    misrepresenting Lambda's job placement rates, and misrepresenting and concealing the true nature of

7    Lambda's financial interest in students' success, including by falsely representing that Lambda only got

8    paid after students found employment and got paid; (ii) misrepresenting and concealing from students

9    that, until August 17, 2020, Lambda did not have the necessary approval from the California Bureau for

10   Postsecondary Education ("BPPE") to operate as a school, and was under order by the BPPE to cease

11   operations, stop enrolling students, cease all instructional services, and submit a closure plan; (iii) in

12   violation of California law, enrolling, signing tuition payment plans with and providing educational

13   services to students before Lambda obtained the BPPE's approval to operate; and (iv) in violation of

14   California law, engaging in the unlawful business practice of unlicensed lending.

15        6.    Plaintiffs and members of the proposed class are current and former Lambda students

16   who either (1) entered into ISAs, retail installment contracts, deferred tuition plans, installment plans,

17   lump-sum payment plans, or other tuition plans (hereinafter "tuition payment plans") with an arbitration

18   clause that contains a carve-out for proceedings "commenced by either party seeking an injunction . . .

19   or any other equitable remedy," or (2) enrolled at Lambda without signing (or opting out of) an

20   arbitration clause and class action waiver. On information and belief, this includes students who

21   enrolled at Lambda from on or around March of 2020 to the present.[1]

22        7.    Plaintiffs and members of the proposed class enrolled at Lambda under false pretenses.

23   Plaintiffs seek declaratory and injunctive relief to cancel their tuition payment plans and those of all

24   class-members, to declare the tuition payment plans null and void, to require equitable restitution of all

25   payments made to Lambda, and for additional relief. They also seek public injunctive relief, including

26   enjoining Defendants from misrepresenting job placement rates, and entering into or collecting on any

27

28   _____

     [1] While the tuition payment plans from March 2020 to the present contain arbitration clauses and class
     action waivers, neither apply to this proceeding.

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**                                    2

tuition payment plan entered into while Defendants engaged in such misrepresentations. Plaintiffs lack an adequate remedy at law to obtain these remedies and make them whole. For example, remedies at law cannot cancel tuition payment plans, preclude payments pursuant to uncancelled tuition payment plans, protect against possible liability pursuant to those plans, enjoin Defendants from collecting upon or otherwise enforcing those plans, enjoin Defendants from misrepresenting job placement rates and entering into or collecting on any tuition payment plan entered into while Defendants maintained such misrepresentations, declare Defendants' job placement rate representations to be fraudulent and misleading in violation of California law, nor declare that Defendants knowingly operated a private postsecondary institution without approval to operate and in violation of California law.

## II.    THE PARTIES

8.    Plaintiff Jessica Fuller is a resident of Lakewood, Pierce County, Washington. She signed her ISA on April 22, 2020. She was enrolled as a student at Lambda from June 2020 until September 2020, at which point she withdrew from her program. Plaintiff Fuller's ISA is attached as Exhibit A.

9.    Plaintiff Alexander Goncalves is a resident of Philadelphia, Philadelphia County, Pennsylvania. He signed his ISA on May 20, 2020. He was enrolled as a student at Lambda from June 2020 until January 2021, at which point he graduated from his program. Plaintiff Goncalves's ISA is attached as Exhibit B.

10.    Plaintiff Brett McAdams is a resident of Apopka, Orange County, Florida. He signed his ISA on June 15, 2020. He was enrolled as a student at Lambda from July 2020 until March 2021, at which point he graduated from his program. Plaintiff McAdams's ISA is attached as Exhibit C.

11.    Plaintiff Quinn Molina is a resident of Olympia, Thurston County, Washington. He signed his ISA on January 8, 2021. He was enrolled as a student at Lambda from January 2021 to May 2022, at which point he graduated from his program. Plaintiff Molina's ISA is attached as Exhibit D.

12.    Defendant Lambda is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 250 Montgomery Street, Floor 16, San Francisco, California 94104 and/or 149 New Montgomery Street, 4th floor, San Francisco, CA 94101.

13.     Defendant Austen Allred is Lambda's founder and CEO. Upon information and belief, Mr. Allred resides in San Francisco, California, and/or did so during times relevant to the events described herein.

14.     Defendants John Does 1-9 are officers and/or directors of Lambda as well as individuals, corporations, or other entities who may own all or a portion of Plaintiffs' and class members' tuition payment plans or any other financial interest in such tuition payment plans.

## III.    <u>JURISDICTION AND VENUE</u>

15.     Although Plaintiffs contend that this Court lacks subject matter jurisdiction over this matter, the Court's November 13, 2023 Order (Doc. 52) held that this Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

16.     This Court has personal jurisdiction over Defendants because Defendant Lambda's principal place of business is in the County of San Francisco, California, and its contacts with California are so continuous and systematic that it is essentially at home in this state; Defendant Allred, upon information and belief, resides in the County of San Francisco, California, and/or did so during times relevant to the events described herein; and Defendants regularly conduct and solicit business in California and have caused injuries in the County of San Francisco and the State of California through their acts, and by their violation of the UCL, FAL, and CLRA. At all times relevant to this complaint, the misrepresentations alleged herein—including misrepresentations of job placement rates and state approval status—emanated from California, including at Defendants' headquarters in San Francisco, California,[2] where the majority of Lambda's leadership team resides and works.[3] Upon information and

---

[2] *See, e.g.*, Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (Mr. Allred explaining that Lambda "moved from our beloved 100 square foot office in San Ramon to our San Francisco headquarters in an actual office building downtown."); Lambda School (@LambdaSchool), Twitter (May 1, 2018, 12:41 PM), https://twitter.com/bloomtech/status/991372104674066432 ("[b]ased in Bay Area"); Lambda School CATALOG, June 1, 2019 – May 31, 2020 ("Lambda headquarters is located at 250 Montgomery Street, 16th floor, San Francisco, CA 94102."); Lambda Inc., United States Securities & Exchange Commission Form D at 1 (listing 250 Montgomery Street, 16th Floor, San Francisco, California 94104 as Lambda's "principal place of business").

[3] *See, e.g.*, *About Bloom*, Bloom Institute of Technology Website, https://www.bloomtech.com/about

---

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**                    4

1  belief, these misrepresentations—including those marketed and contained on the Lambda website,

2  Lambda online advertisements, and social media accounts of Lambda and Mr. Allred—were conceived,

3  coordinated, reviewed, approved, or otherwise controlled from California.

4          17.     Venue is proper in the United States District Court for the Northern District of California

5  pursuant to 28 U.S.C. § 1391.

6  **IV.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

7          **A.    LAMBDA BACKGROUND**

8          18.     Lambda is a private, for-profit online coding school founded in 2017 by its current CEO,

9  Austen Allred. Lambda provides online computer science courses of varying lengths. It is not a degree-

10  granting institution, and is not accredited. Students cannot take out federal student loans to attend

11  Lambda.

12         19.     At all times relevant to this complaint, Lambda charged tens of thousands of dollars for

13  its program, more than double the reported average price of online coding bootcamps.[4]

14         20.     As Lambda's CEO, Mr. Allred was the company's primary decisionmaker, in a position

15  of control over daily operations and the company's public representations and status with the BPPE.

16         21.     As Lambda's CEO, Mr. Allred also benefited personally from the tuition paid by

17  Plaintiffs and members of the class.

18         22.     Lambda marketed itself prominently as a place where students learn the skills necessary

19  to obtain employment in the competitive computer technology job market. In Mr. Allred's words, most

20  students come to Lambda with "no network" and are "from either inner cities or rural areas."[5]

21

22

23

24  _____
    (last visited November 27, 2023); *About*, Lambda School Website (May 9, 2020),

25  https://web.archive.org/web/20200509074406/https://lambdaschool.com/about (last visited November
    27, 2023).

26  [4] *See* Cecilia Clark, *How Much is Coding Boot Camp?* Nerdwallet (June 21, 2022, 10:53 AM),
    https://www.nerdwallet.com/article/loans/student-loans/how-much-is-coding-bootcamp.

27  [5] *See* Y Combinator, *A CS Education That's Free Until You Get a Job - Austen Allred of Lambda
    School*, YouTube (Apr. 3, 2019) at 9:10 (hereinafter "Y Combinator Interview"),

28  https://www.youtube.com/watch?v=_yIAYZtdrfI&t=551s.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

23.    Lambda has long touted "experienced industry expert" instructors and a top-of-the-line curriculum that is "designed to get you hired." On April 3, 2019, Mr. Allred stated that Lambda's "educational experience is, I think, among the best in the world."[6]

24.    Part of Lambda's business model is predicated on convincing prospective students to pay a large amount of tuition by promising them that they will not owe anything unless and until they find a job that pays $50,000 or more per year.

25.    Lambda carries out this model by entering into tuition payment plans with students. For example, as Lambda describes its ISAs: "A Lambda School ISA is a contract under which you agree to pay 17% of your post-Lambda School salary for 24 months, but only once you're making more than $50,000 per year (or the equivalent of $4,166.67 per month). The ISA is capped at a maximum repayment of $30,000, so you won't pay more than $30,000 under any circumstances."[7]

26.    Some Lambda tuition payment plans are managed by third-party servicers who handle origination and payment processing.[8] For example, Meratas, a loan-servicing company headquartered in Stamford, Connecticut, services some of the ISAs at issue in this case, including those signed by the Named Plaintiffs.

27.    By April 2019, Lambda was growing at "an insane pace." As Mr. Allred explained:

> We agreed as a team to no longer share the number of students that we have enrolled, but it is not a small number and it is growing at an insane pace. We'll soon be measuring Lambda School scale by percentage of the overall number of students learning to program every year, to give you some context. And being able to support that kind of scale effectively is what keeps me up at night. Mostly specifically hiring, mostly hiring executives right now who can build out 100, 150 person teams beneath them . . . and we need like 5 of them yesterday.[9]

---

[6] *Id.* at 15:05.
[7] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "What is an ISA and how does it work"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].
[8] *The Lambda School Income Share Agreement*, Lambda School Website (scroll to FAQs "Who are Meratas and Leif"), [archived by the Wayback Machine (Dec. 16, 2020), https://web.archive.org/web/20201216131833/https://lambdaschool.com/tuition/isa].
[9] Y Combinator Interview at 47:50.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

28.     Mr. Allred attributed Lambda's growth in part to his active personal Twitter account, stating in January 2020 that his frequent tweets have "certainly helped Lambda school grow."[10]

29.     Mr. Allred also stated: "If there's one thing I'm good at in life, it's growing something quickly, building hype for something quickly. That's kind of my superpower."[11]

30.     Over time, Lambda expanded its tuition payment plan offerings to include, for example, retail installment contracts, deferred tuition plans, multi-part installment payment plans, financing through a third-party loan, a pre-instruction lump sum payment, or ISA varieties that combine an initial lump sum payment with payments from a proportion of future earnings. Upon information and belief, tuition payment plans under each of these categories qualify the student-signatories as putative members of the proposed class, based on their plans either containing the aforementioned arbitration clause carve-out, or based on their enrollment without signing (or opting out of) an arbitration clause and class waiver.

31.     Lambda has attempted to enforce agreements pursuant to these tuition payment plans, including by seeking payment through collections and moving to compel arbitration under these agreements.

**B.     UNTIL AUGUST 17, 2020, LAMBDA OPERATED WITHOUT STATE APPROVAL, IN VIOLATION OF CALIFORNIA LAW**

32.     As a California company with its headquarters and principal place of business in San Francisco, Lambda is subject to the laws of the state of California. One of those laws, California Education Code § 94886, bars private postsecondary educational intuitions from doing business without "approval to operate."

33.     Another, Section 94917, provides that when educational institutions violate this law, any "note, instrument, or other evidence of indebtedness relating to payment" for its programs is "void and not enforceable."

---

[10] Vincent Woo, *Interview with Austen Allred*, Soundcloud (Jan. 22, 2020) at 42:10 (hereinafter "Woo Interview"), https://soundcloud.com/vwoo/interview-with-austen-allred.
[11] Y Combinator Interview at 22:25.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

34.     All Lambda tuition payment plans, including ISAs, are a "note, instrument, or other evidence of indebtedness relating to payment for educational program[s]," under the California Education Code.

35.     On March 20, 2019, the BPPE issued a "Citation: Assessment of Fine and Order of Abatement" ("Citation") to Lambda. The Citation found that Lambda was "operating without Bureau approval," in violation of the California Education Code. A copy of the Citation is attached hereto as Exhibit E.

36.     In the Citation, the BPPE ordered that Lambda "cease to operate as a private postsecondary educational institution" and "submit a school closure plan." The Citation further required Lambda to "discontinue recruiting or enrolling students and cease all instructional services and advertising in any form or type of media, including the https://lambdaschool.com and any other websites not identified here that are associated with the Institution, until such time as an approval to operate is obtained from the Bureau."

37.     On May 14, 2019, Lambda submitted its application to the BPPE seeking approval to operate.

38.     Lambda appealed the Citation and, on July 24, 2019, the BPPE issued an "Appeal of Citation Informal Conference Decision: Citation Affirmed" (the "Citation Affirmance"). The BPPE affirmed the Citation because "[n]o new substantive facts were presented," and thus, Lambda was required to "comply with the orders described in the 'Violation Code Sections' of this document and submit evidence of compliance within 30 days from the date of this decision." Citation Affirmance at 1–3. A copy of the Citation Affirmance is attached hereto as Exhibit F.

39.     In direct violation of California law, the Citation, and the Citation Affirmance, Lambda continued to operate, advertise its educational services to the public, and enroll students.

40.     On August 21, 2019, the BPPE denied Lambda's May 14, 2019 application, stating in a letter to Lambda that it was "unable to grant approval." A copy of the August 21 order is attached hereto as Exhibit G.

41.     On November 25, 2019, the BPPE issued an order denying Lambda's updated application for approval, explaining that "at this time the Bureau is unable to grant approval, based on

1    the requirements of the California Education Code." A copy of the November 25 order is attached

2    hereto as Exhibit H.

3        42.    On June 22, 2020, the BPPE issued yet another order denying Lambda's further updated

4    application for approval to operate, stating that "the Bureau cannot at this time approve Lambda's

5    application." A copy of the June 22 order is attached hereto as Exhibit I.

6        43.    The June 22, 2020 order also found that Lambda's ISAs constitute "an instrument or

7    evidence of indebtedness" under the California Education Code. *Id.* at 5.

8        44.    On August 17, 2020, the BPPE issued an order approving Lambda's application. The

9    approval letter stated that the BPPE had completed its review of Lambda's "Application for Approval

10    to Operate," including "supplemental documentation" received on August 14, 2020. The BPPE found

11    that "[a]pproval to operate is granted *effective August 17, 2020*." (emphasis added). A copy of the

12    August 17 order is attached hereto as Exhibit J.

13        45.    From at least May 2019 until Lambda was approved on August 17, 2020, Lambda's

14    course catalogs falsely stated that Lambda was approved by the BPPE. In at least three versions of the

15    2019 and 2020 catalogs—revised in May 2019, September 2019, and July 2020 (all prior to Lambda's

16    approval)—Lambda falsely stated the following:

17        **APPROVALS**
       Lambda School is a private institution *approved to operate* by the California Bureau for
18       Private Postsecondary Education. Approval to operate means the institution is compliant
       with the minimum standards contained in the California Private Postsecondary Education
19       Act of 2009 (as amended) and Division 7.5 of Title 5 of the California Code of
       Regulations.
20

21    *See* Exhibit K (Excerpts of Three Versions of Lambda Course Catalogs for 2019 and 2020 at 5)

22    (emphasis added)).

23        46.    During the time Lambda was seeking the BPPE's approval, Mr. Allred engaged in a

24    public misinformation campaign about Lambda's legal status. For example, in August 2019, Mr. Allred

25    told Business Insider that Lambda was working with the BPPE to obtain approval and that the order had

26

27

28

been stayed while the application was pending. Mr. Allred stated that "[b]ecause we're talking with BPPE, it doesn't affect students at all."[12] This was false.

47.     In truth, the Citation and Citation Affirmance were not stayed, multiple of Lambda's applications had been denied, and Lambda's future was uncertain. In August 2020, a public information officer with California's Department of Consumer Affairs told Business Insider "that there is no stay on the order, and that if Lambda School is still operating while its registration is pending, it would be in violation of state law."[13]

48.     Upon information and belief, Mr. Allred further commented to Lambda students, including some BPPE Subclass Plaintiffs during their ISA revocability period, over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

49.     At all times Mr. Allred knew or should have known that ISAs and other financing instruments issued by Lambda were void and unenforceable under California Law due to Lambda's lack of approval to operate.

50.     Throughout 2019 and 2020, prior to Lambda's August 17, 2020 approval, Lambda and Mr. Allred further misrepresented Lambda's approval status by using a number of recognized attributes of an approved academic institution in its advertising and promotional materials. During this period, Lambda's name, website, and the website URL itself – lambdaschool.com – used the term "school", and Lambda's website, ads, and social media continuously displayed the following school crest:

*Screenshot from Lambda's website on April 22, 2020.*



---

[12] Rosalie Chan, *The hot Silicon Valley coding bootcamp Lambda School is paying a $75,000 fine for not registering properly with the state of California*, Business Insider (Aug. 29, 2019, 6:32 PM), https://www.businessinsider.com/lambda-school-coding-bootcamp-california-bppe-2019-8.
[13] Rosalie Chan, *A California official says red-hot coding bootcamp Lambda School is violating state law if it operates without the right registration — but the company insists classes can go on*, Business Insider (Aug. 30, 2019, 8:54 PM), https://www.businessinsider.com/lambda-school-california-state-law-coding-bootcamp-y-combinator-2019-8.

51.     During this period, Lambda's website, online ads, and social media continuously and repeatedly referred to various features of an approved academic institution, including, for example, a "curriculum," "tuition," "students," "student body," being "enrolled," an academic "schedule," "graduates," "mentors," "grades," "lectures," "homework," and "career support": [14]

[14] *See, e.g.*, Lambda School (@LambdaSchool), Twitter (Dec. 10, 2019, 9:52 PM), https://twitter.com/bloomtech/status/1204609786718801922; Lambda School Instagram (Mar. 16, 2020), https://www.instagram.com/p/B9zG7NvjhyS/; *Curriculum*, Lambda School Website, [archived by the Wayback Machine (May 6, 2020), https://web.archive.org/web/20200506051614/https://lambdaschool.com/curriculum].

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

*Screenshot from Lambda's website on May 6, 2020.*



*Screenshot of a March 16, 2020 Lambda Instagram post.*



52.    Mr. Allred furthered the appearance that Lambda was approved to operate in similar terms. In his "Letter from the CEO" at the beginning of Lambda's March 2020 outcomes report, he refers to the Lambda "student body" growing to 2,900, with Lambda staff growing to 200, and moving the Lambda headquarters to an office building in downtown San Francisco based on that growth.  He refers to a "curriculum" that is "mastery-based," "graduation," "career support," and "the school." He acknowledged that Lambda "students place great trust in Lambda School when they enroll, and they make incredible investments of time and energy while engaged in our programs."[15]

53.    Had the plaintiffs who signed their ISAs prior to August 17, 2020, been aware that Lambda was operating without a license, was not approved to operate, and that its future legal status was uncertain, they would not have signed tuition payment plans that indebted them for up to tens of thousands of dollars to Lambda. Indeed, no reasonable consumer would enroll and indebt themselves to a program operating unlawfully and under orders to close.

---

[15] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (last visited November 27, 2023).

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**                    13

54.    As set forth herein, the plaintiffs who signed their ISAs prior to August 17, 2020, seek to represent a BPPE Subclass, comprising students who entered into a tuition payment plan prior to the BPPE's August 17, 2020 approval, and either (1) whose tuition payment plans contain an arbitration clause with a carve-out for any proceeding commenced by either party seeking an injunction or any other equitable remedy, or (2) enrolled at Lambda without signing (or opting out of) an arbitration clause and class action waiver.

55.    All such tuition payment plans, including ISAs, constitute a "note, instrument, or other evidence of indebtedness relating to payment for [students'] educational program," under the California Education Code, and therefore, as a matter of law, are "void and not enforceable." California Education Code § 94917.

## C.    LAMBDA'S FALSE AND MISLEADING JOB PLACEMENT RATES

56.    Mr. Allred describes Lambda as "entirely vocational, we're a trade school basically, and we want to help you make as much money as you can."[16]

57.    One of the most important statistics for prospective students was Lambda's purported record of successfully placing students in computer technology careers. Defendants understood that students would only enroll if Lambda would help them secure a job. As Lambda describes it, job placement is "the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole."

58.    To that end, for the past six years, since Lambda's inception, and continuously through today, Lambda and Mr. Allred have engaged in an extensive and long-term campaign to advertise false and misleading job placement rates. Lambda and Mr. Allred prominently display Lambda's purported record of job placement on the Lambda website, in marketing materials and outcomes reports, in a variety of online and social media advertisements (upon information and belief, including Google, YouTube, and various social media), and through social media postings and comments, including Mr. Allred's personal social media accounts.

---

[16] Y Combinator Interview at 13:00.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1. **False and misleading job placement rates on Lambda's website and outcomes reports**

59.    Throughout 2018 and 2019, Lambda's website advertised job placement rates of over 80%. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

60.    On August 2, 2018, Mr. Allred, Ben Nelson (co-founder and CTO), and Ryan Holdaway (VP of Outcomes), stated the following in a post on the Lambda School Blog: "[E]very single Lambda School graduate who has been on the job market for six months is either employed in a full-time role as a software engineer or has joined an early startup working for equity."[17]

61.    Yet on August 3, 2018—the very next day—Lambda's executive leadership team reprimanded Lambda's Director of Career Readiness for poor job placement rate performance, sending her an "Employee Corrective Action Form." The form stated that the employee's "performance in recent months has not met the expectations for the Career Coach/Director of Career Readiness role at Lambda School. Overall placement numbers are low and the time to placement is much higher than desired."

62.    The Corrective Action Form continued:

Placements are the most critical component of Lambda's operations, not only in the School's obligation to its students, but to the prosperity of the company as a whole. A common discussion point in regards to Outcomes is that current placement rates are too low and time to placement is too high. Creative tactics and adjustments to current careers processes as well as follow through are needed to improve both of these measurements. . . .

CS1 students graduated on 1/19/18. Since then we've had a new class graduate approximately every five weeks. As of 8/1/18, only 16 students of the 48 graduated students assigned to [the Lambda career placement employee] have been placed.

63.    Two months later, on October 8, 2018, Lambda continued to tout its high job placement rates, announcing on its website: "Since Lambda School's inception in April 2017, over 75 Lambda

---

[17] Austen Allred, *Introducing Lambda Next — Our Revolutionary New Job Search and Placement Program*, Medium: Lambda School Blog (Aug. 2, 2018), https://medium.com/lambda-school-blog/introducing-lambda-next-our-revolutionary-new-job-search-and-placement-program-603ef12f7d37.

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**          15

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

School graduates have been hired, including 83% of early cohorts, with an average salary increase of over $47,000 per hired graduate."

64.    Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on December 13, 2018.*



65.    The representation of an 83% job placement rate remained on the Lambda website until on or about February 2019.

66.    The disparity between Lambda's public representations and private statements would only grow. From on or about April 2019 until at least December 2019, Lambda's website advertised a job placement rate of over 85%. For example, on April 18, 2019, Lambda's website contained the following statement across the top of the page:

*Screenshot from Lambda's website on April 18, 2019.*



67.    In May of 2019—at the same time Lambda was advertising an 85.9% job placement rate and touting its transparency—Lambda executives sent a private memorandum to investor Y Combinator. *See* Lambda Memorandum to Investors, *Human Capital: The Last Unoptimized Asset Class* at 10 (May 2019), attached hereto as <u>Exhibit L</u>. The May 2019 memo stated:

**We're unable to place students at scale**
- We're at roughly 50% placement for cohorts that are 6 months
  graduated
- Placement to date has been manual and one-off, which isn't
  possible at scale

Ex. L at 10.

68.    After the memorandum was published in news accounts two years later, Mr. Allred tweeted from his personal account that he was the one who made the 50% placement representation to investors, stating: "The 50% came from me telling investors about what % of enrolled students get jobs that require repayment."

69.    Despite Mr. Allred's contrary statement to investors, Lambda's website continued to represent an 85.9% or 86% placement rate through the end of 2019. These rates were false and misleading.

70.    On December 14, 2019, Lambda's homepage stated:



*Screenshot from Lambda's website on December 14, 2019.*

71.    This statement was false and directly contrary to the true facts known to Lambda and Mr. Allred, which had privately been disclosed to investors, as described above.

72.    When asked in an interview to explain the discrepancy between the representations on Lambda's website and representations to its investors, Mr. Allred explained: "I mean you're literally looking at what are the risks, right? Like,we're going to pick our lowest number for that – there are cohorts that have been at 50% placed within 6 months, yes."[18]

---

[18] Woo Interview at 13:00-14:30.

73.     When asked whether the advertised 86% job placement rate was accurate, he stated: "the way that that number was measured was an average across cohorts at a specific time. I don't know what it is right now, but that's directionally correct."[19]

74.     On February 19, 2020, New York Magazine published an article titled "Lambda School's Misleading Promises," in which the writer concluded that Lambda was "selling unprepared students an incomplete education, fueled by overpromising marketing and misleading, if not downright fraudulent, figures."[20] The story described Lambda's job placement rate misrepresentations and also recounted an interview with a former employee who "confirmed . . . that the company's own internal numbers, which the interviewee was provided as part of their interview process, seem to indicate a roughly 50 percent or lower placement rate."[21]

75.     Lambda nonetheless persisted in promoting false and misleading job placement statistics on its website and elsewhere.

76.     In 2020, Lambda started to promote its placement rates through "outcomes reports" published on its website and shared through social media. Multiple outcomes reports included an "Independent Accountants' Report" directed "To the Management" of "Lambda Inc." located at "250 Montgomery Street[,] San Francisco, CA 94104".

77.     The first outcomes report, titled "H1 2019 Outcomes Report," was published on March 27, 2020,[22] and reported a 79% placement rate.[23]

---

[19] *Id.* at 11:13-11:26.

[20] Vincent Woo, *Lambda School's Misleading Promises*, New York Magazine (Feb. 19, 2020), https://nymag.com/intelligencer/2020/02/lambda-schools-job-placement-rate-is-lower-than-claimed.html.

[21] *Id.*

[22] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report].

[23] *See H1 2019 Report Lambda School Outcomes Report*, Lambda School Website, [archived by the Wayback Machine (Sept. 3, 2020), https://web.archive.org/web/20200903023542/https://lambdaschool.com/reports/2019-outcomes-report].

78.     The 79% placement rate remained up on Lambda's website until December 3, 2020, when Lambda published its "H2 2019 Outcomes Report."[24] The H2 2019 report showed a 74% placement rate.[25]

79.     The 74% rate announced in the H2 2019 report remained up on Lambda's website until November 7, 2021, when Lambda announced its 2020 outcomes.[26] In the 2020 outcomes report, Lambda announced that the placement rate remained at 74%.

80.     Until November 1, 2022, Lambda continued to report the 74% placement rate from the 2020 outcomes report on its website:

# 74%

Job placement rate for BloomTech graduates

**BloomTech 2020 Outcomes Report**

*Screenshot from Lambda's homepage on September 30, 2022.*[27]

81.     On November 2, 2022, Lambda published the "BloomTech 2021 Outcomes Report," advertising a 90% placement rate. As of November 2, 2022, Lambda's website provided:

---

[24] *See* Austen Allred, *Announcing the Release of Our H2 2019 Student Outcomes Report*, Lambda School Website (Dec. 3, 2020), [archived by the Wayback Machine (Dec. 14, 2020), https://web.archive.org/web/20201214214247/https://lambdaschool.com/the-commons/announcing-lambda-school-h2-2019-student-outcomes-report].

[25] *Id. See also H2 2019 Report Lambda School Outcomes Report*, Lambda School Website [archived by the Wayback Machine (Dec. 3, 2020), https://web.archive.org/web/20201203230224/https://lambdaschool.com/reports/h2-2019-outcomes-report].

[26] *See Bloom Institute of Technology 2020 Outcomes Report,* Bloom Institute of Technology, [archived by the Wayback Machine (Nov. 25, 2021), https://web.archive.org/web/20211125162824/https://www.bloomtech.com/reports/outcomes-report]. It appears that Lambda only published one outcomes report in 2020. *See BloomTech Reports*, Bloom Institute of Technology Website, https://www.bloomtech.com/reports/archive (last visited Mar. 14, 2023).

[27] *See Built For Your Success*, Bloom Institute of Technology Website, [archived by the Wayback Machine (Sept. 30, 2022) https://web.archive.org/web/20220930032702/https://www.bloomtech.com/outcomes].

# 90%

Job placement rate for BloomTech graduates

**BloomTech 2021 Outcomes Report**

*Screenshot from Lambda's homepage on November 27, 2022.*[28]

82.      In a "Letter from the CEO" dated November 2, 2022, Mr. Allred wrote: "In this independently examined report, you'll gain a transparent view of how our learners and graduates fared in 2021. Our biggest takeaway: A full **90% of our 2021 graduates have landed jobs**, which is the highest rate in our company's history."[29]

83.      Lambda's website *still* advertises a 90% placement rate. As of December 6, 2023, Lambda's homepage continues to tout a "90% job placement rate in 2021 for job-seeking grads."[30]

84.      Like the earlier rates from 2018 and 2019, the rates Lambda published from 2020 to the present (including, but not limited to, the 79%, 74%, and 90% rates from outcomes reports) were, and continue to be, false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

85.      Business Insider reported in October 2021 that documents from a Lambda "all-hands" meeting in January 2021 "showed that Lambda School placed only around 30% of its 2020 graduates in qualifying jobs during the first half of 2020. This figure is in stark contrast to the 74% placement rate it advertised for its 2019 graduates, the latest figure the school has made publicly available. . . ."[31]

---

[28] *See Built For Your Success,* Bloom Institute of Technology Website, [archived by the Wayback Machine (Nov. 27, 2022), https://web.archive.org/web/20221127122732/https://www.bloomtech.com/outcomes].
[29] *See* Austen Allred, *Letter from the CEO*, Bloom Institute of Technology Website (Nov. 2, 2022), https://www.bloomtech.com/reports/outcomes-report#letter (last visited Mar. 14, 2023) (emphasis in original, internal citation omitted).
[30] *See* Bloom Institute of Technology Home Page, https://www.bloomtech.com/ (last visited December 6, 2023).
[31] *See* Vincent Woo, *Lambda School promised a fast and cheap path to a lucrative tech career. Leaked documents and former students cast doubt on that claim.* Business Insider (Oct. 25, 2021, 7:30 AM), https://www.businessinsider.com/lambda-school-promised-lucrative-tech-coding-career-low-job-placement-2021-10.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

86.    This "all hands" meeting took place one month after Lambda published the 74%

placement rate in the H2 2019 Outcomes Report.

87.    A slide prepared by Lambda reveals that the H1 2020 placement rate was only 33% and

the H2 2020 rate was 40%, a far cry from the 74% listed on the Lambda website until November 2,

2022. According to the same slide, Lambda's H1 2021 *goal* was 60% placement and H2 2021 *goal* was

80%:

## Long-Term Student Success Goals

| | H1 2020 | H2 2020 | H1 2021 | H2 2021 | Metric | Description |
|---|---|---|---|---|---|---|
| **Admissions** | 1277 | 1450 | TBD | TBD | Unit 2 Starts | # students starting Unit 2. |
| **School** | 52% | **56%** | 60% | 80% | % Graduating within 11 Units | % of students who start Unit 2 complete coursework within 11 units. |
| **Outcomes** | 33% | **40%** | 60% | 80% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment** | 72% | **79%** | 85% | 87% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |

88.    On information and belief, a Lambda executive presented the slide at the "all-hands"

meeting at Lambda's headquarters in San Francisco, California.

89.    Another slide, titled "Lambda H1 Company OKRs," provided that the "actual"

placement rate for H1 2020 was 33% of graduates placed within 180 days, and the actual rate for H2

2020 (as of October 2020) was 27% of graduates placed within 180 days. This slide also listed the H1

2021 goal as 60%:

/ / /

/ / /

/ / /

/ / /

/ / /

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

## Lambda H1 Company OKRs

| | H1 2020 | H2 2020 | H1 2021 | Metric | Description |
|---|---|---|---|---|---|
| **Admissions Goal** Admissions Actual | n/a 1277 | 1450 ~850 | 1500 | Unit 2 Starts | # students starting Unit 2. |
| **School Goal** School Actual | n/a 52% | 56% 52% | 60% | Extended Grad Rate % | % of students who start Unit 2 complete coursework within expected time window |
| **Outcomes Goal** Outcomes Actual | n/a 33% | 40% 27% | 60% | % Qualified Placement within 180 days | % of graduates get high paying jobs within 180 days. |
| **Repayment Goal** Repayment Actual | n/a 41% | 75% 73% | 85% | % Repaying within 60 days | % of qualified placed graduates have made a first payment within 60 days. |
| **Alumni Goal** | n/a | n/a | 40% | % Alumni Giving back | % of hired alumni giving back |

*H2 2020 Actuals as of October 2020

90.     Another slide, reportedly used at another all-hands meeting in February 2021, broke out the 180-day placement rates by month, from February to July 2020, as follows:

| Graduation Month | Qualified Placed % (days elapsed since graduation) | | |
|---|---|---|---|
| **Month** | +90d | +180d | QP Now |
| Feb - 2020 | 20% | 31% | 41% |
| Mar - 2020 | 19% | 30% | 36% |
| April - 2020 | 17% | 24% | 32% |
| May - 2020 | 13% | 27% | 32% |
| Jun - 2020 | 15% | 25% | 27% |
| Jul - 2020 | 18% | 24% | 25% |
| Aug - 2020 | 16% | | 21% |
| Sept - 2020 | 13% | | 14% |
| Oct - 2020 | 10% | | 11% |
| Nov - 2020 | | | 11% |
| Jan - 2021 | | | 11% |
| **Weighted Avg.** | 16% | 27% | |
| **H2 Goal** | | 40% | |

91.     In yet another slide, reportedly also used at the "all hands" meeting on January 28, 2021, Lambda's H1 2021 "goal" was to enroll 500 students a month and place 50% to 70% in qualifying jobs. The graph also shows that, if Lambda enrolled 2,000 students per month, it could become profitable even if fewer than half of its students found jobs:



92.     Prior to signing their ISAs, Plaintiffs read Defendants' representations that Lambda's job placement rate was above 70%. Lambda's purported record of successfully placing students was critical to their decision to enroll.

**2.     Lambda's false and misleading statements about job placement in social media postings and comments.**

93.     In addition to advertising job placement rates on its website and in outcomes reports, Lambda's job placement marketing campaign expanded to social media posts and comments, including Twitter, Facebook, and Instagram. Like the rates on its website and in outcomes reports, these rates, ranging from 71% to at least 91%, were false and misleading. Lambda and its executive leadership, including Mr. Allred, knew that these widely disseminated rates were false and misleading.

94.     Examples of false and misleading job placement rates on Lambda's Twitter, Facebook, and Instagram accounts include:

FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT          23

1

2

3

4

5

6

    a) April 6, 2018, Lambda Twitter: "Time for another update on placement. Students hired by Lambda School are not included. Cs1: 75% hired within first two months of search."[32]

    b) March 5, 2019, Lambda's Twitter account linked to a report touting an 85.9% job placement rate and stated: "Lambda only succeeds when our students succeed, and we're committed to a transparent, no-surprises approach to education."[33]

    c) April 22, 2020, Lambda Instagram: "Percentage of H1 2019 graduates that have been placed into jobs. → 71%"[34]



    d) September 27, 2021, Lambda Instagram: "77% of H2 2019 job-seeking Data Science graduates were hired. 94% [o]f those hired graduates go the job in the first 180 days"[35]

---

[32] Lambda School (@LambdaSchool), Twitter (Apr. 6, 2018, 12:39 PM), https://twitter.com/bloomtech/status/982311747301330944.

[33] Lambda School (@LambdaSchool), Twitter (Mar. 5, 2019, 7:02 PM), https://twitter.com/bloomtech/status/1103083315945328640.

[34] Lambda School (@LambdaSchool), Instagram (Apr. 22, 2020), https://www.instagram.com/p/B_S2M-Llm2y/.

[35] Lambda School (@LambdaSchool), Instagram (Sept. 27, 2021), https://www.instagram.com/p/CUWJM1qJlEB/?img_index=4.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP



e) November 3, 2022, Lambda Instagram: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[36]



---

[36] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 3, 2022), https://www.instagram.com/p/CkgVeHBrmP9/.

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**    25

f)   November 3, 2022: Lambda Facebook: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[37]

g)   November 3, 2022, Lambda Twitter: "90% of our 2021 alumni gained in-demand skills and landed great jobs—our highest placement rates *ever*!"[38]

h)   November 4, 2022, Lambda Facebook: "Fun Fact: Did you know, 90% of our 2021 full Stack Web job-seeking graduates found a job after BloomTech?"[39]

i)   November 7, 2022, Lambda Facebook: "91% of our 2021 job-seeking Data Science graduates found a job 🎉"[40]

j)   November 9, 2022, Lambda Instagram: "91% of 2021 job-seeking Data Science grads found a job after BloomTech"[41]

### 3. <u>Mr. Allred's false and misleading statements about job placement and role as driving force behind Lambda's job placement rate marketing campaign</u>

95.    At all times relevant to this complaint, Mr. Allred was the driving force behind Lambda's job placement rate marketing campaign. Rather than passively overseeing the campaign, he personally spearheaded Lambda's dissemination of false and misleading rates, oftentimes promoting the rates himself on his own social media accounts.

96.    For example, since March 2020, when Lambda first promoted its job placement rates through outcomes reports, each outcomes report has begun with a personalized letter from Mr. Allred titled "Letter from the CEO," vouching for the rates in the report. The reports end with Mr. Allred's signature.

97.    Mr. Allred also advertised false and misleading rates on his personal Twitter account:

---

[37]Bloom Tech (@BloomTech), Facebook (Nov. 3, 2022), https://www.facebook.com/BloomTech/posts/pfbid0C9MRRryV1zaMpSXa35QnogkPDAR984bjs9xmen4WJB4SWMtkWAn2kxZ7BRC11Kdhl.

[38] Bloom Tech (@BloomTech), Twitter (Nov. 3, 2022, 11:15 AM), https://twitter.com/bloomtech/status/1588203108013850629.

[39] Bloom Tech (@BloomTech), Facebook (Nov. 4, 2022), https://www.facebook.com/BloomTech/posts/pfbid025d3iVN2usd1eLKfwTMCh78a3kVNpsmUcRCsMXWinqtYX4tHqLbkDHQz9mhqUZuanl.

[40] Bloom Tech (@BloomTech), Facebook (Nov. 7, 2022), https://www.facebook.com/BloomTech/posts/pfbid0UpByQ5eFsctoNH51QuK1DPrTXYXvaU9cPbE2H6weYnnvR2YbpWF2m8vLGbuuoUhol.

[41] Bloom Tech (@Bloomtechofficial), Instagram (Nov. 9, 2022), https://www.instagram.com/p/CkwHe8ivDND/.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

a) March 13, 2019: In response to a commenter asking about a $60,000 median salary and 83% 6-month employment rate for Lambda's main web track, Mr. Allred responded, "That's low now, but our average student increases his or her income by $47,000."[42]

b) March 15, 2019: "Lambda School's first iOS class graduates today. 66% of them are already **hired.**"[43]

c) November 16, 2019: "First track just graduated. Hit 100% hired but was VERY small sample size." Subsequent reporting revealed that this small sample size consisted of a single student.[44]

d) November 3, 2022: "I am so incredibly excited to finally be able to share BloomTech's 2021 Outcomes Report. Highlights: *All-time high 90% placement rate for job-seeking grads".[45]

98.    Other examples of false, misleading, and exaggerated claims on Mr. Allred's Twitter account include:

a) January 24, 2021: "I think we're like 2-3 solvable problems being solved away from 100% of Lambda School grads being hired. Still a lot of unknowns, but I think it will be possible." When a commenter asked what the problems were, Mr. Allred responded: "Boring stuff."[46]

b) April 22, 2021: "When I started Lambda School early detractors gave me hell because I said that Lambda School would cause thousands of people to become millionaires who wouldn't have otherwise been. It's now pretty clear that was very conservative."[47]

c) May 4, 2021: "I get to watch a bunch of people double their income (or more) every single day. Even the worst days are punctuated by a bunch of people changing their lives and the lives of their families forever."[48]

---

[42] Austen Allred (@Austen), Twitter (Mar. 13, 2019, 12:14 PM), https://twitter.com/Austen/status/1105879911036665856.

[43] Austen Allred (@Austen), Twitter (Mar. 15, 2019, 5:20 PM), https://twitter.com/Austen/status/1106681485275205634.

[44] *See* Zoe Schiffer & Megan Farokhmanesh, *The High Cost of a Free Coding Bootcamp*, The Verge (Feb. 11, 2020, 11:15 EST), https://www.theverge.com/2020/2/11/21131848/lambda-school-coding-bootcamp-isa-tuition-cost-free; Ryan Mac (@RMac18), Twitter (Feb. 11, 2020, 1:59 PM), https://twitter.com/RMac18/status/1227306243733295108.

[45] Austen Allred (@Austen), Twitter (Nov. 3, 2022, 12:20 PM), https://twitter.com/Austen/status/1588219699157905408.

[46] Austen Allred (@Austen), Twitter (Jan. 24, 2021, 1:55 AM), https://twitter.com/austen/status/1353234915643568128.

[47] Austen Allred (@Austen), Twitter (Apr. 22, 2021, 10:24 AM), https://twitter.com/Austen/status/1385238109185396740.

[48] Austen Allred (@Austen), Twitter (May 4, 2021, 11:50 PM), https://twitter.com/Austen/status/1389789532761956352.

d) May 4, 2021: "You can go from near poverty to huge future wealth in just a few months."[49]

e) November 24, 2022: "Thankful today for all those who have worked so hard for BloomTech (by current name or by Lambda School). So many people working so diligently. Thousands of lives changed, billions in increased earnings."[50]

99.    Mr. Allred and Lambda acted willfully and knowingly to disseminate Lambda's job placement representations to the public—including applicants to their school such as Plaintiffs —with knowledge that they were, and continue to be, false and misleading.

**4.    While inflating its job placement rates, Lambda misrepresents that it only gets paid once students do**

100.    In addition to the placement rates, Lambda and Mr. Allred misled the public with the frequently repeated declaration that: "We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job."[51] For example, on June 27, 2019, Lambda's homepage stated:

## Higher learning. Higher earning.

Lambda is designed for student success. We don't get paid until you do, so we're in this together, from your first day of classes to your first day on the job — and beyond.

*Screenshot from Lambda's homepage on June 27, 2019.*

101.    Mr. Allred regularly touted that Lambda only gets paid when students do on his personal social media accounts and the Lambda website, describing Lambda's business as based on shared and aligned incentives between Lambda and its students:

---

[49] Austen Allred (@Austen), Twitter (May 4, 2021, 11:53 PM), https://twitter.com/Austen/status/1389790386659364868.
[50] Austen Allred (@Austen), Twitter (Nov. 24, 2022, 9:51 AM), https://twitter.com/austen/status/1595822473781485568.
[51] *See, e.g.*, Apply Now Pages, Lambda School Website [archived by the Wayback Machine (June 27, 2019), https://web.archive.org/web/20190627024024/https://lambdaschool.com/].

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**          28

a) "The main directive in everything we did can be summed up in two words: incentive alignment."[52]

b) "Our mission from day one has been to **align the incentives of school and student**, giving more people the opportunity they deserve to land a great job with a higher income. If our students don't succeed, our school shouldn't either."[53]

102.    In reality, Lambda packaged and sold its ISAs to investors long before students obtained employment. As early as May 2019, Lambda privately told investor Y Combinator: "Currently we sell some income share agreements to hedge funds." Ex. L at 2.

103.    To facilitate the sale of ISAs, Lambda partnered with Edly, a digital marketplace that helps schools sell ISAs to third-party investors. On December 11, 2019, Edly tweeted: "Pleased to announce our latest offering [–] a Lambda School ISA Pool. We @edlyISA are excited to work with the amazing team @LambdaSchool[], one of the most impactful ISA programs in the country."[54] To learn how to participate, Edly invited interested investors to join a webinar that night with Mr. Allred.[55]

104.    Lambda did not disclose this fact to students until public reporting exposed it, and for many months Mr. Allred flatly denied it, stating in October 2019 on Twitter that "We never, ever get paid up front for ISAs."[56]

## D.    LAMBDA ENGAGED—AND STILL ENGAGES—IN THE UNLAWFUL BUSINESS PRACTICE OF UNLICENSED LENDING

105.    The California Financing Law "shall be liberally construed and applied to promote its underlying purposes and policies," which include "protect[ing] borrowers against unfair practices by

---

[52] Austen Allred, LinkedIn (2019), https://www.linkedin.com/posts/austenallred_announcing-our-new-isa-financing-blueprint-activity-6636140633306333184-dkOh?utm_source=share&utm_medium=member_desktop.

[53] *See* Austen Allred, *Announcing the Release of Our H1 2019 Student Outcomes Report*, Lambda School Website (Mar. 27, 2020), [archived by the Wayback Machine (Apr. 23, 2020), https://web.archive.org/web/20200423031203/https://lambdaschool.com/the-commons/announcing-the-release-of-our-h1-2019-student-outcomes-report] (emphasis in original).

[54] @edlyISA, Twitter (Dec. 11, 2019, 3:01 PM), https://twitter.com/edlyISA/status/1204853625459216385 (on file with Plaintiffs' counsel).

[55] @edlyISA, Twitter (Dec. 11, 2019, 3:02 PM), https://twitter.com/edlyISA/status/1204853900177743872 (on file with Plaintiffs' counsel).

[56] Woo Interview at 6:30 (wherein Mr. Allred confirms that this tweet was "totally correct").

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**                    29

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1  some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code
2  § 22001(a)(4).

3  106.    Pursuant to the California Financing Law: "No person shall engage in the business of a
4  finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code §
5  22100(a).

6  107.    Lambda is not and never has been registered in California as a finance lender or broker
7  under the Financing Law.

8  108.    Since its inception, Lambda has operated as a "finance lender" because its tuition
9  payment plans qualify as either consumer or commercial loans under the Financing Law. *See generally*
10  Cal. Fin. Code § 22203-04 (defining consumer loans); Cal. Fin. Code § 22502 (defining commercial
11  loans).

12  109.    Lambda's Meratas ISA provides:

13  THIS IS NOT A LOAN
   In making monthly payments to Lambda School, you will not be repaying
14  a student loan. In the case of a student loan, a student borrows a set amount
   and repays the principal amount of the loan plus interest or a finance charge,
15  or both. Under this agreement, you will instead pay a fixed percentage of
   your income each month for up to a maximum number of payments.
16

17  110.    Contrary to this representation, ISAs are a form of student loan.

18  111.    According to the United States Consumer Financial Protection Bureau ("CFPB"), a
19  representation that an ISA is "not a loan" is deceptive and misleading under the Consumer Financial
20  Protection Act because "ISAs are loans and do create debt."[57]

21  112.    The California Department of Financial Protection and Innovation ("DFPI") agrees,
22  holding that ISAs are student loans: "ISAs made solely for use to finance a postsecondary education are
23  'student loans' for the purposes of the SLSA [California Student Loan Servicing Act]."[58]

24
25  [57] *See* Better Future Forward, Inc., et al., CFPB No. 2021-CFPB-0005, Consent Order at ¶ 23 (Sept. 7,
   2021) (finding *available at:* https://files.consumerfinance.gov/f/documents/cfpb_better-future-forward-
26  inc_consent-order_2021-09.pdf).
   [58] *See In the Matter of Student Loan Servicing Act License Application of Meratas Inc.* NMLS No.
27  2120180, Consent Order at ¶ M (Ca. Dep't of Fin. Prot. and Innovation Aug. 5, 2021), *available at:*
   https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/08/Meratas-Consent-Order.pdf; *see also* Press
28  Release, California Dep't of Fin. Prot. and Innovation, "California DFPI Enters Groundbreaking

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

113.    The United States Department of Education concurs, finding that ISAs "used to finance expenses for postsecondary education are private education loans under 34 C.F.R. 601.2(b)."[59]

114.    The BPPE also found in its June 22, 2020, order denying Lambda approval to operate that Lambda's ISA is "an instrument or evidence of indebtedness" under the California Education Code. *See* June 22, 2020 Letter from BPPE to Lambda at 5, attached hereto as Exhibit I.

115.    Because Lambda is in the business of making ISAs and other tuition payment plans, it is operating as a finance lender under the California Financing Law.

116.    Lambda's failure to register as a finance lender deprived Plaintiffs and the class of the borrower protections provided by the California Financing Law.

117.    Lambda has therefore engaged in the unlawful business practice of making a loan without a license in violation of California Financial Code § 22100, and, in turn, in violation of the unlawful prong of the UCL.

118.    Had Plaintiffs been aware that Lambda was acting as an unlicensed finance lender, they would not have signed tuition payment plans that indebted them for up to tens of thousands of dollars to Lambda.

E.    **PLAINTIFFS ATTEND LAMBDA, ATTRACTED BY HIGH JOB PLACEMENT RATES AND THE APPEARANCE THAT THE "SCHOOL" WAS APPROVED TO OPERATE**

1.    **Plaintiff Jessica Fuller**

119.    Ms. Fuller has long been interested in coding, back to when she learned website design as a hobby as a kid. She aspired to eventually turn her hobby into a career, but the time commitment and expense of college curricula made them a nonstarter.

120.    Once Ms. Fuller experienced a lull in her work as a fitness trainer during the onset of the COVID-19 pandemic, she thought she had an opportunity to revisit a tech career after seeing Lambda

---

Consent Order with NY-Based Income Share Agreements Servicer" (Aug. 5, 2020), https://dfpi.ca.gov/2021/08/05/california-dfpi-enters-groundbreaking-consent-order-with-ny-based-income-share-agreements-servicer/.

[59] *See* FSA Announcement, General-22-12, *Income Share Agreements and Private Education Loan Requirements* (Mar. 2, 2022), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-02/income-share-agreements-and-private-education-loan-requirements. *See also* 87 Fed. Reg. 65,453 ("[T]he Department clarifies that ISAs and other alternative financing products should be treated like institutional loans.").

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**                    31

advertisements in March and April of that year. Lambda was immediately appealing, with a slew of Facebook, Instagram, and YouTube ads promising a career without college. After seeing the ads, Ms. Fuller visited Lambda's website and watched YouTube videos about the program to learn more throughout March and April 2020. She was drawn to the job placement rate of 79% on the Lambda website outcomes report and at least the same rate on Lambda social media ads during March and April 2020.

121.    The rates Ms. Fuller saw on the Lambda website and social media ads were false and misleading, and both Lambda and Mr. Allred knew they were false and misleading. (*See* ¶¶ 56–99, *supra*.)

122.    This record of successfully placing students was critical to her decision to enroll, and led her to believe that her enrollment would result in being hired for a tech position.

123.    Ms. Fuller further believed that Lambda was approved to operate due to Defendants' continuous and repeated descriptions on the Lambda website, Lambda ads, and social media of various features of Lambda that gave the appearance that it was a credible, legitimate, and lawfully operating school. These included, but were not limited to, descriptions of Lambda's curriculum, tuition, students, student body, enrollment, academic schedule, graduates, mentors, grades, lectures, homework, and career support. After she enrolled, and during her ISA revocability period, she continued to believe that Lambda was approved to operate, and Mr. Allred reinforced that belief with comments over the Lambda Slack channel that any regulatory issues were mere technicalities that did not affect the school's ability to operate.

124.    Swayed by Defendants' false job placement rates and representations and appearance that Lambda was a government-approved school, Ms. Fuller signed an ISA with Lambda on April 22, 2020. A copy of Ms. Fuller's ISA is attached hereto as Exhibit A.

125.    Had Defendants truthfully represented Lambda's job placement rates, Ms. Fuller would not have enrolled in Lambda's educational services, or signed an ISA that indebted her up to $30,000 of tuition to Lambda. Furthermore, Ms. Fuller would not have enrolled in Lambda's educational services, or signed an ISA that indebted her up to $30,000 of tuition, had she known that Lambda was not lawfully approved to operate.

126.    Ms. Fuller began attending Lambda part-time in June 2020 and immediately found the instruction confusing and unhelpful. Recognizing that she could not rely on Lambda exclusively, she resorted to buying supplemental courses.

127.    Soon thereafter, in early September 2020, Lambda made a surprise announcement that it was restructuring Ms. Fuller's program. Lambda would no longer take attendance, provide grading, or offer one-on-one team leads. Feeling like Lambda was eliminating the program she originally enrolled in, and with her ISA tuition amount of $30,000 still partially refundable, Ms. Fuller took a hiatus for the rest of 2020. With no sign that Lambda would improve its program, she permanently withdrew in January 2021.

128.    Following her withdrawal, Ms. Fuller researched other avenues for obtaining a job in the tech field. She eventually found a free coding bootcamp called #100Devs, designed for students without degrees or coding experience. She felt like the program was the right fit for her, and could provide her with the skills, experience, and opportunities Lambda did not.

129.    Indeed, the #100Devs program taught Ms. Fuller what she needed to ultimately get a job. Her new coding skills enabled her to apply for and accept a position as Director of Software Development with ThriveDX.

130.    Lambda played no role in her success in the #100Devs program, finding out about ThriveDX, or ultimately getting hired there.

131.    Since the fall of 2023, Ms. Fuller has reduced her hours at ThriveDX and started a university-based IT program—something she believes would be unnecessary had Lambda lived up to its promises. She has not made an ISA payment based on her post-Lambda employment because she has not met the ISA income threshold.

### 2.    Plaintiff Alexander Goncalves

132.    Mr. Goncalves has long had an interest in working in the tech field. During college he completed coding coursework, on top of additional self-taught software development skills. After he was let go from his sales job at a tech startup during the onset of the COVID-19 pandemic, Mr. Goncalves began researching Lambda in April 2020 based on a friend's recommendation. The friend was optimistic about Lambda landing students jobs, based on Lambda's marketed job placement rates

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

and job readiness curriculum. (The friend later became disillusioned with Lambda after learning the job placement rates were inflated.)

133.    When Mr. Goncalves reviewed Lambda's website, social media, YouTube ads, and other promotional materials for himself in April and May 2020, he was likewise attracted by Lambda's impressive—and prominently displayed—job placement rates, including in an Instagram post from that time with a 71% job placement rate. He was further attracted to being able to enroll without putting any money down. He corresponded and talked on the phone with Lambda representative Tommy Collison, based out of Lambda's San Francisco headquarters, who further touted likely career outcomes.

134.    These job placement rate representations—including the rate in the Instagram post—were false and misleading, and both Lambda and Mr. Allred knew they were false and misleading. (*See* ¶¶ 56–99, *supra*.)

135.    Based on these job placement representations, Mr. Goncalves felt confident Lambda would get him a tech job.

136.    Mr. Goncalves further believed that Lambda was approved to operate due to Defendants' continuous and repeated descriptions on the Lambda website of various features of Lambda that gave the appearance that it was a credible, legitimate, and lawfully operating school, including, but not limited to, descriptions of Lambda's tuition, students, student body, enrollment, academic schedule, graduates, mentors, office hours, and lectures.

137.    Swayed by Defendants' false job placement rates and representations and appearance that Lambda was a government-approved school, he signed an ISA with Lambda on May 20, 2020. A copy of Mr. Goncalves's ISA is attached hereto as Exhibit B.

138.    Had Defendants truthfully represented Lambda's job placement rates, Mr. Goncalves would not have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of tuition to Lambda. Furthermore, Mr. Goncalves would not have enrolled in Lambda's education services, or signed an ISA that indebted him up to $30,000 of tuition, had he known that Lambda was not lawfully approved to operate.

139.    Mr. Goncalves began attending Lambda full-time in June 2020. As with Ms. Fuller, Lambda restructured Mr. Goncalves's program in September 2020, shortening it from a total of nine

**FIRST AMENDED CLASS ACTION COMPLAINT - Case No. 3:23-CV-01440-AGT**        34

months to six months and eliminating team lead support. The loss of team leads was demoralizing. They were the primary means of communicating with Lambda, asking questions, and getting essential debugging help. Still, he persevered and completed his coursework in December and received a certificate of completion in January 2021.

140.    Mr. Goncalves immediately went to work trying to find a job. He used Lambda's job portal, but its postings were either stale or for impractical positions. He ultimately found work through a friend unassociated with Lambda. He first worked as a limited-term front-end developer during the spring of 2021. The same friend then invited him to a different position with the organization Code Ninjas in Boston. During his time with Code Ninjas, between June and December 2021, Mr. Goncalves taught basic coding to kids and ran summer camps and day courses. Lambda played no role in Mr. Goncalves finding either his front-end developer or Code Ninjas positions.

141.    Mr. Goncalves then accepted a job as a software engineer for Virtually, an edtech company, and worked there until June 2022. After Virtually let him go to look for a more senior engineer, Mr. Goncalves found tech positions with design company MODerati, followed by educational tech company Navengage. As with his prior jobs, Lambda played no role in Mr. Goncalves finding these positions.

142.    Mr. Goncalves started making payments on his ISA while working for Code Ninjas and continued during his time with Virtually. In all, he has paid nearly $10,000 towards his ISA, even though Lambda did not have approval to operate when he signed his ISA. Mr. Goncalves would not have signed his ISA had Lambda truthfully represented its job placement rates, and Lambda played no role in him finding any of his post-Lambda employment.

### 3.     Plaintiff Brett McAdams

143.    Mr. McAdams's interest in coding was pragmatic, believing that people who learn to code get good-paying jobs. He first heard of Lambda while looking into coding programs in 2019. Soon after starting his research, he received targeted ads on Google, YouTube, and social media from Lambda. The ads touted a high job placement rate, how quickly students could get their certificate and a high-paying job, and the lack of an up-front cost or any repayment obligation unless students ultimately got a job. By the ads' telling, Lambda was a revolutionary alternative to college.

144.    When Mr. McAdams was laid off from his job in the spring of 2020 at the onset of the COVID-19 pandemic, he decided in April 2020 to consider attending a coding program to start a career in tech. He researched Lambda's website, which prominently displayed a job placement rate approaching 80%, convincing him that Lambda was the best path forward. He also reviewed an outcomes report, either before signing his ISA or soon thereafter, reflecting a job placement rate approaching 80%.

145.    The rates Mr. McAdams saw on the Lambda website and online ads were false and misleading, and both Lambda and Mr. Allred knew they were false and misleading. (*See* ¶¶ 56–99, *supra*.)

146.    Lambda's job placement rates were critical to his decision to enroll, and led him to believe Lambda would lead to a desirable tech position.

147.    Mr. McAdams further believed that Lambda was approved to operate due to Defendants' continuous and repeated descriptions on the Lambda website, Lambda ads, and social media of various features of Lambda that gave the appearance that it was a credible, legitimate, and lawfully operating school, including, but not limited to, descriptions of Lambda's curriculum, a structured program and academic schedule, use of team leads that were marketed as an improvement over college TAs, tuition, students, student body, enrollment, graduates, grades, rubrics, lectures, and homework.

148.    Swayed by Defendants' false job placement rates and representations and appearance that Lambda was a government-approved school, Mr. McAdams signed an ISA on June 15, 2020. A copy of Mr. McAdams's ISA is attached hereto as Exhibit C.

149.    Had Defendants truthfully represented Lambda's job placement rates, Mr. McAdams would not have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of tuition to Lambda. Furthermore, Mr. McAdams would not have enrolled in Lambda's education services, or signed an ISA that indebted him up to $30,000 of tuition, had he known that Lambda was not lawfully approved to operate.

150.    Mr. McAdams began attending Lambda full-time in early July 2020. But as with Ms. Fuller and Mr. Goncalves, Lambda quickly restructured Mr. McAdams's program in September 2020 by shortening it from nine to six months, removing the existing support structure for reviewing work,

and eliminating team lead support. Since the team leads had been an essential component of Lambda's education up to that point, Mr. McAdams thought their elimination seemed troubling. He decided to take a hiatus for the fall of 2020, picking up full-time hours as a bartender.

151.    Mr. McAdams returned in late 2020 with ambivalence. While there was no sign Lambda had improved its program, he had already invested significant time and expense. Already on the hook, he resolved to learn as much as he could through Lambda.

152.    To his surprise, immediately upon returning, Lambda assigned Mr. McAdams as an unpaid team lead to fill the void left by their elimination. The assignment was not optional, Lambda provided no support on how to serve as a team lead, and Mr. McAdams did not find any educational value in the experience. After returning, he spent roughly a third of his Lambda education time mentoring *other* students.

153.    He finished the Lambda program in February 2021 and received his certificate of completion.

154.    Mr. McAdams immediately got to work trying to find a tech job, but Lambda's resources were unhelpful—a job portal lacking useful leads, and resume reviewers with no useful feedback. He continued bartending while looking for tech work and studying on his own what Lambda failed to teach him.

155.    After several months, Mr. McAdams was hired as a backend systems engineer contracting with Florida Blue in August 2021. He eventually moved up the ranks to become senior engineer. Lambda played no role in him finding out about the position, and played no role in ultimately getting hired. As most of the skills and material discussed in Mr. McAdams's interview was self-taught *after* he had finished with Lambda, it was his own studying that landed him the job.

156.    Mr. McAdams made an ISA payment of approximately $1,000 in 2021, even though Lambda did not have approval to operate when he signed his ISA, and even though he would not have signed his ISA had Lambda truthfully represented its job placement rates. A collections agency has contacted him multiple times regarding debt from ISA payments.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1

### 4.    Plaintiff Quinn Molina

2    157.    Mr. Molina became interested in transitioning to programming work in 2020 while

3   working for a company doing wholesale shipping. To get his feet wet, he enrolled in short-term, free

4   coding camps while continuing his day job. He first saw advertisements for Lambda in September to

5   October of 2020. As he searched for additional coding education opportunities in November 2020, he

6   noticed numerous ads on Google and Twitter touting Lambda. These ads prompted Mr. Molina to

7   research Lambda's website, where (in November 2020) he saw an outcomes report advertising a job

8   placement rate of 79%. He also saw an updated, slightly lower, job placement rate on the Lambda

9   website in either December 2020 or January 2021.

10    158.    The rates Mr. Molina saw on the Lambda website were false, and both Lambda and Mr.

11   Allred knew they were false. (*See* ¶¶ 56–99, *supra*.)

12    159.    After this research, Mr. Molina became attracted to Lambda's program based on the

13   promising job placement rate from the Lambda website, and the ISA model that didn't require him to

14   put any money down. He consulted with his brother, a self-taught coder and web developer, who was

15   likewise impressed by the high job placement rate.

16    160.    After significant research and consultation, and ultimately swayed by the high placement

17   rates, including the 79% outcomes report rate, Mr. Molina signed an ISA on January 8, 2021. A copy of

18   Mr. Molina's ISA is attached hereto as <u>Exhibit D</u>.

19    161.    Had Defendants truthfully represented their job placements rates, Mr. Molina would not

20   have enrolled in Lambda's educational services, or signed an ISA that indebted him up to $30,000 of

21   tuition to Lambda.

22    162.    Mr. Molina began attending Lambda part-time in January 2021. Lambda diluted the

23   program and made it far less rigorous soon after the refund period for Mr. Molina's ISA had passed.

24   Lambda dropped the part-time program option, along with multiple project requirements, assessments,

25   and support staff. Mr. Molina had expected Lambda to help him build a portfolio of projects to show

26   off to prospective employers. Instead, with fewer projects and support staff, students were left with a

27   small number of incomplete, buggy projects that were not job market-ready. He also later learned that

28   the assessments Lambda dropped were important to prospective employers.

163.    Many students dropped out in response to Lambda providing only a shell of the program it originally promised. Mr. Molina considered following suit, but knowing he was on the hook for his ISA, he resorted to grinding out the remainder of the coursework.

164.    The Lambda education further deteriorated as Mr. Molina approached completion. Instead of the world-class instructors Mr. Allred had promised, most were recent Lambda graduates themselves. And instructors from earlier units were unexpectedly brought back as stopgaps later in the program, with apparently no prior experience or planned curriculum from which to teach. By the time Mr. Molina reached the final labs unit, his cohort had dwindled from dozens of peers to a handful.

165.    Mr. Molina received his certificate of completion in May 2022. As he transitioned to searching for a job, Lambda's only contribution was connecting him with a resume and LinkedIn profile reviewer. They failed to provide him with any legitimate job leads.

166.    Instead of moving onto a coding position, Mr. Molina continued working in wholesale shipping, just as he had before attending Lambda, until he recently transitioned to the IT department at his company.

## V.    CLASS ACTION ALLEGATIONS

167.    Plaintiffs bring this action on behalf of themselves and as a class action on behalf of the following Class (hereinafter the "Class"):

> *All persons who enrolled at Lambda and:(i) entered into an ISA, retail installment contract, deferred tuition plan, or any other tuition payment plan with an arbitration clause that contains a carve-out for any proceeding commenced by either party seeking an injunction or any other equitable remedy; or (ii) who otherwise did not sign any such agreements with an arbitration clause, or opted out of one; and (iii) who have not yet had their ISA, retail installment contract, deferred tuition plan, or other tuition payment plan cancelled and all payments made to Lambda refunded.*

168.    In addition, Plaintiffs Fuller, Goncalves, and McAdams seek to certify the following subclass (hereinafter the "BPPE Subclass") within the Class:

> *All persons within the Class who enrolled at Lambda prior to August 17, 2020, the date that Lambda obtained the BPPE's approval to operate.*

169.    Plaintiffs reserve the right to amend or modify the Class and BPPE Subclass descriptions, or further divide them into subclasses or limitations as to particular issues.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

170.    This action has been brought and may properly be maintained as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) because there is a well-defined community of interest in the litigation, the proposed class and subclass is easily ascertainable, and the action satisfies Rule 23's requirements.

171.    On information and belief, there are thousands of former Lambda students who are members of the Class, and at least hundreds who are members of the BPPE Subclass. The potential number of class members are therefore so numerous that joinder would be impracticable. The precise number of class members, known only to Defendants, can easily be determined through discovery.

172.    Plaintiffs' claims are typical of the claims of the Class and BPPE Subclass. Plaintiffs were subjected to the same violations of California law, and seek the same types of injunctive relief, restitution, and other equitable relief on the same theories and legal grounds as the members of the class they seek to represent.

173.    Plaintiffs are adequate representatives of the classes because: (a) their interests do not conflict with the interests of the individual class members they seek to represent; (b) they have retained counsel who are competent and experienced in complex class action litigation; and (c) they intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class and BPPE Subclass.

174.    Common questions of law and fact exist as to all members of the Class and the BPPE Subclass, and predominate over any questions solely affecting individual members of the two classes.

175.    Among the questions of law and fact common to the Class are the following:

    a) Whether Lambda's widely disseminated job placement rates were false and misleading, in violation of the UCL, FAL, and CLRA;

    b) Whether Lambda's false and misleading job placement rates are material to a reasonable consumer's decision whether to enroll;

    c) Whether members of the public were likely to be deceived by Lambda's job placement misrepresentations under the UCL;

    d) Whether Plaintiffs and the Class are "consumers" engaging in "transactions" under the CLRA;

e) Whether Mr. Allred directly and actively participated in the unlawful conduct at issue;

f) Whether Mr. Allred, members of his executive leadership team, and other Lambda employees or agents acted willfully and knowingly to disseminate Lambda's job placement representations to the public with knowledge that they were—and continue to be—false and misleading;

g) Whether Lambda qualifies as a "finance lender" under the California Financing Law, Cal. Fin. Code § 22100(a); and

h) Whether Lambda's ISAs and other tuition payment plans qualify as "consumer loans" or "commercial loans" under the California Financing Law.

176. Among the questions of law and fact common to the BPPE Subclass are the following:

a) Whether Lambda had approval to operate prior to August 17, 2020;

b) Whether Lambda misrepresented whether it had approval to operate prior to August 17, 2020;

c) Whether Lambda's approval status would be material to a reasonable consumer's decision to enroll;

d) Whether members of the public were likely to be deceived by Lambda's misrepresentations or misleading representations with respect to its approval status; and

e) Whether tuition payment plans entered into by Lambda prior to August 17, 2020, are void and unenforceable.

177. Class action treatment is superior to any alternative to ensure the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would entail.

178. Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief and corresponding declaratory relief—including ordering cancellation of tuition payment plans, enjoining any effort to collect upon or otherwise enforce those plans, enjoining Defendants from misrepresenting job placement rates in the future and entering into or collecting on any tuition payment plan entered into while Defendants maintained such misrepresentations, declaring

Defendants' job placement rate representations to be fraudulent and misleading in violation of California law, and declaring that Defendants knowingly operated a private postsecondary institution without approval to operate and in violation of California law—is appropriate respecting the class as a whole.

179.    No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

180.    Plaintiffs and each class member have been harmed by Defendants' wrongful conduct.

181.    The Class and BPPE Subclass are ascertainable because their members can be determined from Lambda's business records. On information and belief, the last-known residence address and email address of each of the proposed class members is contained in Lambda's books and records.

182.    Concentrating all the potential litigation concerning the claims of the proposed class members in this Court will avoid a multiplicity of suits, will conserve judicial resources and the resources of the parties, and is the most efficient means of resolving the claims of all the proposed class members.

183.    Absent a class action, Plaintiffs and the proposed class members likely will not obtain redress of their injuries and Defendants will retain the proceeds of the violations of the California laws cited herein.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violations of California's Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*
### (All Defendants)

184.    Plaintiffs hereby reincorporate the allegations in the foregoing paragraphs as though fully set forth herein.

185.    The CLRA makes unlawful "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

186.    The CLRA covers transactions involving the sale of services—such as education—to consumers.

187.    Plaintiffs are "consumers" within the meaning of Section 1761(d) of the CLRA, seeking Lambda's education services for personal, family, or household purposes, and they engaged in "transactions" within the meaning of sections 1761(e)and 1770 of the CLRA.

188.    Education is a "service" within the meaning of Section 1761(b) of the CLRA.

189.    The CLRA enumerates numerous unlawful acts or practices, including:

a)    "Misrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(a)(2).

b)    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." *Id.* § 1770(a)(5).

c)    "Representing that goods or services are of a particular standard, quality, or grade" when they are not. *Id.* § 1770(a)(7).

d)    "Advertising goods or services with intent not to sell them as advertised." *Id.* § 1770(a)(9).

190.    In violation of these provisions, Defendants misrepresented to the public, prospective students, and current students, including Plaintiffs, at least the following: (i) its job placement rates; and (ii) to the Subclass, that it had approval to operate and enroll students.

191.    Plaintiffs bring their claim under the CLRA for equitable relief, including to cancel their ISAs and for restitution of payments made.

### SECOND CAUSE OF ACTION
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(All Defendants)**

192.    Plaintiffs hereby reincorporate the allegations in the foregoing paragraphs as though fully set forth herein.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

193.     Defendants have engaged in business acts or practices that constitute unfair competition as defined in the UCL, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

194.     The business acts and practices include:

a)  publishing and/or providing the public, prospective students, and current students, including Plaintiffs, with false, misleading, unreliable, and/or inaccurate job placement rate information;

b)  to the Subclass, conducting business without BPPE approval and in violation of multiple BPPE orders requiring it to cease operations;

c)  to the Subclass, knowingly operating a private postsecondary institution without approval to do so and knowingly appearing to the public as an approve institution;

d)  to the Subclass, misrepresenting to the public, prospective students, and current students that in March and July of 2019, the BPPE ordered Lambda to cease operations, stop enrolling students, cease all instructional services, and submit a closure plan, and misrepresenting material facts related to those BPPE orders, including representing that they were stayed when they were not.

195.     Plaintiffs' and the Class's tuition payment plans constitute "lost money or property" within the meaning of the UCL.

Unlawful Prong

196.     The UCL bars business practices that are forbidden by law. If a business practice violates any law, it is *per se* a UCL violation.

197.     The business acts and practices described above are unlawful because they violate numerous state and federal laws, including but not limited to:

a)  The Federal Trade Commission Act ("FTC Act"), which prohibits "unfair or deceptive acts or practices."[60]

b)  Cal Educ. Code § 94897(b), which provides that institutions shall not "[p]romise or guarantee employment, or otherwise overstate the availability of jobs upon graduation."

---

[60] *See* U.S.C.§ 45(a)(I); 15 U.S.C. § 52(a).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

c)  The CLRA, *see supra* ¶¶ 184–191;

d)  The FAL, *see infra* ¶¶ 202–04;

e)  Cal. Educ. Code § 94886, which provides in relevant part that "a person shall not open, conduct, or do business as a private postsecondary educational institution in this state without obtaining an approval to operate under this chapter." Lambda violated this provision, and therefore the UCL's unlawful prong, when it enrolled Plaintiffs and members of the Subclass without obtaining approval to operate.

f)  Cal. Educ. Code § 94943, which provides that it is a crime to "[k]nowingly operat[e] a private postsecondary institution without an approval to operate." Lambda violated this provision, and therefore the UCL's unlawful prong, when it knowingly enrolled Plaintiffs without approval by the BPPE to operate.

g)  Cal. Educ. Code § 94917, which provides that "[a] note, instrument, or other evidence of indebtedness relating to payment for an educational program is void and not enforceable unless, at the time of execution of the note, instrument, or other evidence of indebtedness, the institution held an approval to operate … ."

h)  Cal. Educ. Code § 94902(b)(2), which provides that an enrollment agreement is enforceable only if "[a]t the time of the execution of the enrollment agreement, the institution held a valid approval to operate.

i)  The California Financing Law, which provides that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." Cal. Fin. Code § 22100(a).

j)  The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), which prohibits covered persons from engaging in unfair, deceptive, or abusive acts or practices.

198.  By violating these and other state and federal laws, Lambda violated the unlawful prong of the UCL.

<u>Fraud Prong</u>

199.    To show that a business practice is fraudulent, it is necessary only to show that members of the public are likely to be deceived.

200.    Defendants' business acts and practices—including its false job placement rate representations and false representations to the Subclass about BPPE approval—are fraudulent in that they are likely to deceive the public.

201.    Each of these false and misleading representations, all of which were material, were substantial factors influencing Plaintiffs and members of the Class to attend Lambda and take out a tuition payment plan that indebted them for up to tens of thousands of dollars of tuition to Lambda.

**THIRD CAUSE OF ACTION**
**Violations of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(All Defendants)**

202.    Plaintiffs hereby reincorporate the allegations in the foregoing paragraphs as though fully set forth herein.

203.    Defendants have also engaged in acts or practices that constitute violations of the FAL, Business and Professions Code section 17500, *et seq*., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Lambda's services. Defendants' untrue or misleading representations include, but are not limited to, the following:

    a)  Lambda's and Mr. Allred's statements regarding job placement rates, including but not limited to the published job placement rates prominently displayed on its website; and

    b)  Lambda's and Mr. Allred's statements and appearance to the public, prospective students, and current students, including the Subclass, that its operations were lawful, that BPPE had not ordered Lambda to cease advertising and instructional activities, and that it could lawfully enroll students. Lambda's and Mr. Allred's advertisements and marketing implicitly and explicitly misrepresented the lawfulness of its operations by encouraging the public and prospective students to apply for enrollment.

204.    At the time these representations were made, Defendants knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

VII.  **PRAYER FOR RELIEF**

WHEREFORE, in accordance with the above claims, Plaintiffs request judgment in their and the Class's favor against Defendants as follows:

1.    An Order certifying that Plaintiffs and the Class constitute a single class, that the BPPE Subclass constitutes a single subclass, and designating the action as a Class Action pursuant to Federal Rule of Civil Procedure 23.

2.    Appointment of the attorneys below as Class counsel.

3.    Appointment of Plaintiffs as class representatives and payment of compensation as representatives if the Court deems appropriate.

4.    Declare and order that the tuition payment plans entered into by Plaintiffs, the Class, and the BPPE Subclass are unlawful, void, and unenforceable pursuant to Cal. Educ. Code §§ 94886, 94917, and 94943, and the UCL, CLRA, and FAL.

5.    Declare that Defendants conducted business as a private postsecondary educational institution in California without obtaining approval to operate, in violation of Cal. Educ. Code § 94886 and the UCL.

6.    Declare that Defendants knowingly operated a private postsecondary institution without approval to operate, in violation of Cal. Educ. Code § 94943 and the UCL.

7.    Declare that Defendants' job placement rate representations at all times relevant to this Complaint, including presently disseminated rates, were fraudulent and misleading, in violation of the UCL, FAL, and CLRA.

8.    Declare that Lambda "engage[d] in the business of a finance lender or broker without obtaining a license from the commissioner," and continues to do so, in violation of the California Financing Law, Cal. Fin. Code § 22100(a).

9.    Order Defendants—including Lambda, Mr. Allred, and any other owner of all or part of the tuition payment plans—to cancel the tuition payment plans for Plaintiffs and the Class and enjoin any effort to collect upon or otherwise enforce them.

10.   Order Defendants, including Lambda and Mr. Allred, to pay restitution in the form of refunds for all payments made.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

11.    Order prejudgment and post-judgment interest on any refunds for tuition payment plan payments to the maximum extent allowed by law.

12.    Order public injunctive relief, including enjoining Defendants, including Lambda and Mr. Allred, from misrepresenting job placement rates, and entering into or collecting on any tuition payment plan entered into while Defendants maintained such misrepresentations.

13.    Order Defendants to pay reasonable attorneys' fees and costs.

14.    Order all such further relief as the Court deems just and proper.

Dated: December 6, 2023                    **MINER, BARNHILL & GALLAND, P.C.**


By:  ___/s/ Ryan Miller_____
     RYAN MILLER
     DAVID BALTMANIS

**NATIONAL STUDENT LEGAL DEFENSE NETWORK**
     ALEXANDER S. ELSON

**COTCHETT, PITRE & McCARTHY, LLP**
     BRIAN DANITZ

*Attorneys for Plaintiffs and the Proposed Class*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP